## ROBINSON v. CALDWELL.

### (Circuit Court of Appeals, Ninth Circuit. February 4, 1895.)

### No. 188.

1. INDIAN LANDS—INTERCOURSE ACT OF 1834—OREGON TERRITORY.
   The provisions of the intercourse act of June 30, 1834, regulating trade and intercourse with the Indian tribes, did not apply to the Oregon territory, which did not become a part of the United States until the treaty of June 15, 1846; and the act of June 5, 1850, extending the provisions of the intercourse act over the Oregon territory so far as applicable, did not, through the prohibition in the intercourse act of settlement upon Indian lands, affect the rights of settlers who had taken actual possession of lands within that territory before the passage of the act of 1850.

2. SAME—NEZ PERCE TREATY—DONATION ACT.
   The treaty of the United States with the Nez Perce Indians of June 11, 1855, relinquished to the United States the right, title, and interest of the Indians to the country occupied by them, reserving for their own use a specified part. It also contained a clause providing that certain land occupied

by one C., though within the boundaries of the reserved portion, should not form part of the reservation. *Held*, that by this treaty the title to the land so occupied by C. was fully vested in the United States, and such land came within the terms of the donation act of September 27, 1850, granting titles to settlers upon lands in the Oregon territory.

3. PUBLIC LANDS—DONATION ACT—PROOF OF TITLE.

The donation act of September 27, 1850, granting lands to settlers in the Oregon territory, required that the settler, within a certain time after survey should be made, or, if already made, within the same time after settlement, file a notice of the land claimed and certain proof of settlement with the surveyor general, who should then issue a certificate showing the lands to which the settler was entitled. In 1853 an act was passed requiring persons entitled to the benefit of the donation act to file, in advance of the making of public surveys, a notice setting forth their claims to the benefit of the donation act, with proof of settlement. *Held*, that one who had settled on unsurveyed land, and who, within the time limited by the act of 1853, filed his notice and proofs under that act, and was only prevented from complying with the terms of the donation act by the failure of the government to extend its survey over the lands claimed by him, was entitled, though he had never received a patent, to be quieted and protected in his possession of the land, and could convey the same right to his grantee.

Appeal from the Circuit Court of the United States for the District of Idaho.

This was a suit by William A. Caldwell against Joseph Robinson to quiet complainant's title to certain lands in the state of Idaho. The circuit court rendered a decree for the complainant. 59 Fed. 653. Defendant appeals. Affirmed.

James H. Forney, for appellant.

Rothchild & Ach, for respondent.

Before McKENNA and GILBERT, Circuit Judges, and HAWLEY, District Judge.

GILBERT, Circuit Judge. William Craig, a native-born citizen of the United States, was on the 6th day of July, 1838, married to Isabel Craig, an Indian woman, belonging to the Nez Perce tribe of Indians. On the 15th day of September, 1846, Craig and his wife located and settled upon the land in controversy in this suit. The land was then a part of the lands occupied by the Nez Perce Indians in what is now the state of Idaho, and it is included within the boundaries of the present Nez Perce Indian reservation. Craig and his wife continued to reside upon the land and cultivate the same from the 15th day of September, 1846, until the 4th day of June, 1855, upon which latter date Craig filed his notification with the register and receiver of the land office of the then territory of Washington, at Olympia, in said territory, for the settlement of said land, which notification was as follows:

"Pursuant to the act of congress approved on the 14th day of February, 1853, entitled 'An act to amend an act entitled "An act to create the office of survey-or-general of public lands in Oregon, and to provide for the survey, and make donations to settlers of the public lands," and amendments thereto,' I, William Craig, of Walla Walla county, in the territory of Washington, hereby give notice of my claim to donation of 640 acres of land, particularly bounded and described as follows: 'Beginning at a stake 30 yards north of Lapwai creek; thence two miles to a pile of rocks; thence south half a mile to a stake; thence

east two miles to a cottonwood tree; thence north half a mile to the place of beginning.' "

On June 19, 1855, said Craig filed in said land office his own affidavit and the affidavits of Henry M. Chase, William C. McKay, and Louis Raboin. These affidavits are to the effect that the affiants are disinterested parties; that they are personally acquainted with William Craig, and know that he has personally resided upon and cultivated said tract of land continuously from the 15th day of October, 1849; and Raboin's affidavit contains the further statement that Craig and his wife have lived together as man and wife from the 6th day of July, 1838, and that they are and were reputed by their neighbors to be man and wife during said period. After making the said proofs, Craig and wife received a letter from the officers of the land office, where the same were filed, notifying Craig that his filing and proof were complete, and that he had as complete a title to said land as could be acquired prior to issuing a patent, and that patent could not issue until the government survey had been extended over the country. In the year 1870, one D. P. Thompson, while engaged in making and extending the first surveys of the government from township 35 N., range 3 W., P. M., in which is included the land in controversy, made a survey of the Craig claim at the request of one Joseph K. Vincent, tenant thereof under the heirs of William Craig, and was paid for said survey by said Vincent. A plat of this survey was made, and kept on file in the office of the Indian agent at Lapwai, Idaho. In the month of October, 1887, in reply to a letter written by R. J. Monroe, attorney for the heirs of William Craig, and for one Samuel Phinney, who had acquired an interest from the Craig heirs in said land, the commissioner of the general land office notified said Monroe that the proof of said William Craig was deficient, for the reason that it was not accompanied by the affidavit required by section 12 of the donation act, approved September 27, 1850, and that no certificate of the surveyor general or the register and receiver of the local land office appears to have been made, setting forth the facts in the case, and specifying the land to which the party is entitled, as is prescribed by the seventh section of said act. On the receipt of this letter, said Phinney, through his attorney, on December 20, 1890, made application to the surveyor general of Idaho for an order of survey of said land. On March 14, 1891, said surveyor general replied that he had no authority to issue said order, for the reason that said lands were included in the lands of the Nez Perce Indian reservation. On receipt of this letter, the attorney for Phinney and the Craig heirs applied to the commissioner of the general land office for patent, inclosing the plat and notes of the survey made by said D. P. Thompson in 1870, together with the affidavit of said Vincent, in which the facts concerning the settlement by Craig and the survey of said claim by said Thompson are set forth. The commissioner of the land office refused to issue a patent, on the ground that the treaty provisions of the 11th of June, 1855, conferred no title or authority to issue title to Wil-

liam Craig and wife, but simply granted a right to occupancy so long as the Indian title to the reservation remains unextinguished; and the further ground that congress, in preamble approved March 3, 1873 (17 Stat. 627), construed the right of Craig as a personal right to occupy the land, that his right ceased with his death; and upon the further ground that no affidavit seems to have been made by said Craig, as required by the twelfth section of the donation act, and that no certificate of the surveyor general or receiver and register appears to have been made, setting forth the facts in the case, as required by the seventh section of said act; and upon the further ground that the said land was not subject to donation entry when Craig made his settlement, for the reason that the Indian title had not then been extinguished.

The defendant, Joseph Robinson, is the United States Indian agent of the Nez Perce Indians in Idaho. As such Indian agent, and acting under the direction of the commissioner of Indian affairs and the secretary of the interior, he has ordered the plaintiff to remove from said land. The said William Craig and wife, on February 13, 1869, conveyed all their right, title, and interest to said Phinney and one Moses H. Rice. Subsequently, the said Rice conveyed his interest to Phinney, and Phinney, under the said conveyance, went into the possession of and continued to occupy and cultivate the said land until the 9th day of March, 1891, when he conveyed an undivided one-half interest in the tract to said W. A. Caldwell, the complainant, who thereupon went into possession of said land, together with said Phinney.

On the 29th day of January, 1894, upon the facts stated above, the circuit court granted a decree adjudging the respondent to be the true and lawful owner of an undivided one-half interest in said land, and quieting his title thereto, and enjoining the defendant from interfering with his possession of said premises.

The assignments of error upon the appeal bring to our consideration two principal questions: First. Was the land in controversy subject to location and settlement by William Craig and wife under the provisions of the donation act? And, second, were the necessary steps taken by them, under the provisions of that act, to entitle them to a patent to the land, or to the relief awarded by the decree? It is contended that the land in controversy was Indian country at the time William Craig entered into the possession of the same, and that its character as Indian country has remained unchanged from that time to the present day, and that by virtue of the act of June 30, 1834, commonly known as the "Intercourse Act," no valid settlement could be made upon the land so long as the right of the Indians remained unextinguished. The act of June 30, 1834, is entitled "An act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers." It defines the Indian country to be all that part of the United States west of the Missouri river not included in the states of Missouri and Louisiana or the territory of Arkansas, and all lands east of that river not within any state "to which the Indian title

has not been extinguished." It contains many provisions for the regulation of trade and intercourse with the Indians in the Indian country. In section 11 is found the reference to settlement by whites upon the Indian lands. A penalty is therein denounced against any person who shall make a settlement upon or survey "any lands belonging, secured, or granted by treaty with the United States to any Indian tribe." At the time this act was adopted, there had been no treaty with the Nez Perces; no lands had, by statute, contract, or treaty, been recognized as belonging to them. In its dealings with the Indians the United States has uniformly denied their title to any of the lands within its domain. In Johnson v. McIntosh, 8 Wheat. 574, the nature of the right of the United States in the Indian country was considered at length, and the conclusion was there reached that the absolute title to all such lands is vested in the United States, subject only to the Indian right of possession, and that the government possesses the absolute right to extinguish that. In view of this well-known attitude of the United States towards the Indian title, and taking into consideration the fact that the intercourse act contemplates residence of whites within the Indian country as the same is therein defined, the true interpretation of section 11 would seem to be that the lands upon which settlement is therein prohibited are such only as have been confirmed to the Indians by treaty with the United States. The other lands in the Indian country, although they are described in the act as lands to which the Indian title has not been extinguished, were never in fact recognized by the United States as "belonging" to the Indians.

But it is not deemed necessary in this case to determine the true construction to be given to that provision of the act of June 30, 1834. That act refers only to lands that were "a part of the United States" at the time of its enactment. It cannot be extended in its application to territory that was subsequently acquired, or over which the United States subsequently asserted jurisdiction. Although the northern boundary of the United States westward as far as the Rocky Mountains was established by treaty with Great Britain as early as October 20, 1818, the land to the westward thereof, including the territory in which the land in controversy is situated, was, by the express agreement of the contracting powers in that treaty, left free and open to the citizens and subjects of the United States and Great Britain, without prejudice to the claims of either to the said country, and without affecting the claims of any other power or state to any part thereof. In 1827 the provisions of that treaty were further extended; and it was not until June 15, 1846, that the territory of Oregon became a part of the United States, and subject to the exclusive jurisdiction thereof. This was the decision of the Oregon courts at an early date. U. S. v. Tom, 1 Or. 27; U. S. v. Seveloff, 2 Sawy. 312, Fed. Cas. No. 16,252. In the interval between the two treaties last mentioned, many emigrants from the states had settled in

the Oregon territory.   By the year 1843, a sufficient number of settlers had taken up claims to justify the formation of an independent provisional government by adopting the organic law, which two years later was re-enacted.   In the law so adopted, the right of each male settler to a claim not to exceed 640 acres was expressly protected.   The people governed themselves under the organic law until congress, by the act of August 14, 1848, organized the territory of Oregon, and declared the laws of the United States extended over and "in force in said territory so far as the same or any provision thereof may be applicable."

On June 5, 1850, congress, recognizing the fact that the law of 1834 was not in force in the Oregon territory, enacted (9 Stat. 437):

"That the law regulating trade and intercourse with the Indian tribes east of the Rocky Mountains, or such provisions of the same as may be applicable, be extended over the Indian tribes in the territory of Oregon."

At the time this law went into effect, Craig had been in the possession of his claim for nearly four years, and many other settlers had taken like claims in lands similarly situated throughout the territory.   In extending to the Oregon territory such of the provisions of the law of 1834 as were applicable, it is clear that congress had no intention to extend the provisions of section 11 to lands such as that held by William Craig.   Up to that date, congress had made no treaty with any Indian tribe in the Oregon territory.   On the 27th of September of the same year, congress enacted the donation act, providing for granting titles to settlers upon lands in that territory, and expressly recognizing certain rights of the settlers under the laws of the provisional government, but making no reservation whatever of Indian lands.   Both these enactments were made with reference to conditions then known to exist.

By the terms of the donation act, the public lands within the territory were granted to every white settler who was then, or who, on or before December 1, 1851, should become, a resident thereon, provided he were a citizen of the United States or had declared his intention to become such.   The provisions of this act applied as well to the settlement of William Craig as to that of any other settler in the territory.   Craig and his wife were still in possession of the land as donation claimants when, on June 11, 1855, the first treaty between the United States and the Nez Perce Indians was made.   12 Stat. 957.   By the terms of that treaty, the Indians relinquish and convey to the United States their right, title, and interest in and to the country occupied by them, which is therein described by metes and bounds; but they reserve to themselves out of the lands so described a certain portion, also described by metes and bounds, for the use and occupation of the tribe, and as a general reservation for other friendly tribes, "all which tract" it is stipulated "shall be set apart, and so far as necessary surveyed and marked out, for the exclusive use and benefit of said tribe, as an Indian reservation."   Thereafter follows article 10, providing as follows:

"The Nez Perce Indians having expressed in council a desire that William Craig should continue to live with them, he having uniformly shown himself

their friend, it is further agreed that the tract of land now occupied by William Craig, and described in his notice to the register and receiver of the land office of the territory of Washington on the 14th day of June last, shall not be considered part of the reservation provided for in this treaty, except that it shall be subject, in common with the lands of the reservation, to the operation of the intercourse act."

By the language of this article, both the contracting parties expressly recognize the right of William Craig and the validity of his entry under the donation act. The mention of his notice to the register and receiver serves the double purpose to identify his land and to acknowledge the character of his settlement to be that of a donation claimant. There is further the express stipulation that this land shall not be a part of the reservation. What was the reservation? It was that part of the lands reserved to the use of the Indians out of the larger tract which they first relinquished to the United States. William Craig's claim was included in the lands which they had so relinquished, but it was not included in the lands reserved. The Indian right of occupancy in his land was fully extinguished, and the complete title was vested in the United States. The force of the express exclusion of Craig's land claim from the reservation is not abated by the further stipulation that it shall be subject to the provisions of the intercourse act. This imposes no limitation upon Craig's tenure, or upon the ultimate title which he is to acquire. It was essential to the integrity of the reservation that the donation land claim wholly surrounded by Indian lands should, so long as the reservation and the intercourse act should remain in existence, be made subject to the same regulation of trade and intercourse with the whites that attached to the reservation. When Craig's notice was filed, therefore, with the register and receiver, the settlement of himself and his wife upon their claim was clearly within the terms of the donation act, and the land was subject to settlement under that law from the date of its enactment.

It remains to be considered whether such steps were taken by Craig and his wife as to entitle them to the benefits of the act. Section 4 contains the words of the grant as follows:

"That there shall be and is hereby granted to every white settler, etc., now residing in said territory, or who shall become a resident thereof on or before the first day of December, eighteen hundred and fifty, and who shall have resided upon and cultivated the same for four consecutive years and shall otherwise conform to the provisions of this act," etc.

Sections 6 and 7 contain the provisions that must be conformed to. In substance, they are that the settler must within 3 months after survey is made, or, if the survey has been previously made, within 3 months after settlement, notify the surveyor general of the precise tract claimed by him, and must within 12 months after the survey has been made, or within 12 months after settlement where the survey has been previously made, prove to the satisfaction of the surveyor general that the settlement and cultivation required by the act have been commenced, specifying the time of the commencement; and he must also, at any time after the expiration of 4 years from the date of settlement, prove

in like manner, by two disinterested witnesses, the fact of continued residence and cultivation. And, upon such proof being made, the surveyor general, etc., shall issue a certificate "setting forth the facts in the case, and specifying the lands to which the parties are entitled."

It is urged that Craig failed to conform to these provisions, and that, by reason thereof, he has not placed himself within the description of the persons to whom the grant is made. The steps which the donation land claimant is by the act required to take are for the purpose of producing the proper proof that he is, as he claims to be, a resident and cultivator upon the land, and has been such for the requisite period of time, and that he belongs to the class of persons to whom the land is given. All these steps refer to and are dependent upon a public survey of the land. If the survey is not made, the settler is powerless to produce the requisite proofs. The failure of Craig to conform to the donation act resulted solely from the fact that no survey was made of his land. But on February 14, 1853, for the protection of the rights of settlers residing upon unsurveyed lands, congress amended the donation law, by requiring all persons who were entitled to the benefit of the fourth section of the act to file with the surveyor general, in advance of the time when public surveys shall be extended over the particular land, a notice in writing setting forth their claims to the benefits of the act, and the required particulars in reference to settlement and cultivation. By the act of July 17, 1854 (10 Stat. 306), the settlers were given until December 1, 1855, to comply with the amendment. Craig filed the required notice on June 4, 1855, and 15 days later he filed affidavits containing the particular facts of his settlement and residence upon the claim. No objection was made to the form of his papers, and nothing further was required of him. He received notice from the officers of the land office at Olympia to the effect that his filing and proof were complete, and that he had as complete a title to said land as could be acquired prior to issuing a patent, and that patent could not be issued until the government survey had been extended over the country.

At the date the donation act took effect, William Craig was a settler who had already resided upon and cultivated his claim for four years, and was in other respects qualified to take as a grantee. But for the requirements of the law as to notification and proof, which are contained in sections 6 and 7, the grant to him would have been in praesenti. The title was to pass to him upon his placing himself in the status of a grantee by complying with certain formalities. Therein was he to "otherwise conform to the provisions of the act." These steps he has taken, so far as it was possible, before a survey. He has done all that the law demanded of him. That he did not obtain a patent was owing to no default of his. Even if it should be held that he never became qualified to receive the title, and that he never became the grantee of the soil, he was, nevertheless, entitled to all the re-

lief that was accorded the appellee in the court below in any view of the case, for he had, as was said in Hall v. Russell, 101 U. S. 510, "a present right to occupy and maintain possession, so as to acquire a complete title to the soil," and that right has been lawfully conveyed to the appellee. Craig's grantees have endeavored to obtain a government survey, and to perfect their title. In 1870 they paid the expense of a survey that was made by the surveyor then engaged in surveying government lands in the township in which the claim is situated. In 1887 they were informed by the commissioner of the general land office that William Craig's proofs were deficient, because unaccompanied by the affidavit required by section 12 of the donation act, and because no certificate had been made by the surveyor general or the register and receiver, as provided in section 7. These were not valid reasons. The affidavit made necessary by section 12 applied only to settlements made subsequent to December 1, 1850, and the provisions of section 4, making void all sales and contracts of sale of lands before patent is issued, were repealed by the act of 1854 (10 Stat. 306, § 2); and, if the provisions of section 7 were not complied with, it was due solely to the nonaction of the officers of the government.

It is our judgment that the appellee has such right in the land in controversy as to entitle him to the relief afforded in the decree which is appealed from, and that decree is accordingly affirmed.