MAXEY ET AL. VS WRIGHT, U. S. INDIAN INSPECTOR, ET AL.

Opinion delivered January 6, 1900.

*1. Indian Treaties—Occupation Tax—Removal of Intruders.*

The Creek Indian Treaty of 1856 guarantees to the Creeks, so far as compatible with the constitution of the United States, the right of self-government and full jurisdiction over persons and property within their limits; and declares all persons not

members of said tribe, within the limits of the nation, except by consent of the nation, intruders and subject to removal by the Government. Under this treaty, a white man not a citizen of the nation, practicing law therein, who fails to pay the occupation tax imposed by the laws of the nation, is an intruder and subject to removal by the Interior Department, acting on behalf of the Indian Nation.

2. *"Curtis Bill"—How Affects Indians' Rights—Lawyers as Officers of Courts.*

The Act of Cong. June 28, 1898 (30 Stat. 495) known as the "Curtis Bill," although authorizing t'e creation of cities and towns in the Creek Nation, conferring power to organize into municipal corporations, and extinguishing the Indian title to lands embraced within the limits of such municipal corporations, does not now limit the Indians' right of occupancy of their lands and control over persons residing therein, for this provision of the act has not yet been carried into effect, and it is still their country.

The fact that a white person, otherwise an intruder and subject to removal, is a lawyer practicing in the United States courts in the Creek Nation, does not exclude him from the provisions of the treaty, nor relieve him from the effect of the Indians' law; for he is not an officer performing a public duty.

3. *Indian Occupation Taxes—Right of U. S. Indian Agent to Collect.*

The authority and superintending control of the U. S. Government, exercised through the Interior Department by instructions to Indian Agents, conferred by the intercourse laws (Rev. Stat. U. S. Sec. 2058), has not been taken away by any subsequent act of Congress or treaty with the Indians; and in collecting the Indian occupation tax, upon penalty of removal of those refusing to make such payment, the Indian agent was acting strictly in accordance with regulations of the Secretary of the Interior in a matter coming within the purview of the intercourse laws.

Appeal from the United States court for the Northern district.

JOHN R. THOMAS, Judge.

Action by N. B. Maxey and others against J. George Wright, United States Indian inspector, and others. From an order sustaining a demurrer to the complaint, plaintiffs appeal. Affirmed.

*W. T. Hutchings* and *Thos. Marcum*, for appellants.

*P. L. Soper, U. S. Atty.*, and *L. F. Parker, Jr., Asst. U. S. Atty.*, for appellees.

CLAYTON, C. J.    This is an action brought in equity n the United States court at Muskogee, Ind. T., to enjoin J. George Wright, United States Indian inspector for the Indian Territory, and J. Blair Shoenfelt, United States Indian agent for the Five Civilized Tribes, from collecting from plaintiffs, who are all noncitizens of the Creek Nation, and attorneys at law residing in the Creek Nation, and practicing law in said court, an occupation tax imposed on them by virtue of the laws of the Creek Nation, which, among other things, provides that a tax of $25 per annum shall be collected from each lawyer residing and practicing his profession in the Creek Nation who is not a citizen of the Creek or Seminole Nation.    To the complaint the following demurrer was filed: ''Come now the said defendants, by Pliny L. Soper, United States attorney for the Northern district of the Indian Territory, and demur to the complaint of plaintiffs, and for ground therefor state (1) that the court has no jurisdiction of the subject matter of the action; (2) that the complaint does not state facts sufficient to constitute a cause of action against these defendants, or for which any equitable relief may be granted.''    The court below sustained this demurrer and, plaintiffs refusing to plead further, the cause was dismissed.    Exceptions to the sustaining of the demurrer and dismissal of the complaint were duly saved, and the cause regularly appealed to this court.

It is contended by the appellants, first, that the Creek

Nation has no power to enforce this tax on a citizen of the United States residing in that nation, because it is claimed that the Creek Nation is not possessed of such sovereign powers as would permit it to levy a tax upon the person or occupation of any other than its own citizens; and to support this contention we are cited to the opinion of Atty. Gen. Wirt on the right of the Cherokee Nation to impose a tax on traders. 1 Ops. Attys. Gen. 645. This opinion was rendered in 1824, at which time, by virtue of the treaties then existing between the Cherokee Nation and the United States, the Cherokee Nation had relinquished that right. That opinion is based exclusively on the treaty of 1785 The attorney general says: "The time has passed away in which it would be tolerated to treat these people as we please, because we are Christians and they are heathens. If the tax is to be resisted, we must find some solid ground for that resistance, which law and reason will support, and which we can justify both towards God and man. If, by the treaties which they have entered with us, they have debarred themselves from imposing this tax, they cannot justly complain if we insist on the fulfillment of these treaties, and the withdrawal of the tax as far as it shall be found in conflict with their own stipulations. * * * Now, the stipulation of the treaty of 1785 is that 'the United States in congress assembled shall have the sole and exclusive right of regulating the trade with the Indians, and managing all their affairs in such manner as they think proper.' The right thus conferred on the United States is sole and exclusive. Consequently, neither the Cherokees nor any other nation had the right thereafter to touch the subject which was thus solely and exclusively given to the United States. What was the right thus solely and exclusively given to the United States? The right of regulating the trade with the Indians. What does this mean? The right of regulating the conduct of the citizens of the United States in carrying on

this trade?   This cannot be the meaning, because this right the United States had before, and it required no treaty to give it to them.   The treaty meant to give a right which did not exist before, and this could only be the right to pre-scribe the whole system of regulations, on both sides, under which the trade should be carried on.   *   *   *   But, if it were conceded that the Cherokee Nation might prohibit this trade altogether, it would not follow that they might, under these treaties, tolerate it under such regulations as they might institute, for, whether the power of entire prohibi-tion has been given to congress or not, the sole and ex-clusive power of regulation has been given to them; and, so long as these treaties remain in force, it seems manifest that the Indians have no power to interfere. with those regula-tions, either by addition or subtraction; and what is a tax upon persons authorized by congress to trade without it, but a new and distinct regulation superinduced upon the regulations provided by congress?''   It is clear that the at-torney general founds his opinion upon the fact,   as he finds it, that the Cherokee Nation had ''debarred themselves from imposing this tax.''   But no such stipulations and abroga-tion of right can be found in any treaty between the United States and the Creeks; but, upon the contrary, in all of their treaties with  the government,  and more especially by the treaty of 1856 (Revision of Indians  Treaties,  111), they  have  carefully  guarded  their  sovereignty,   and their right to admit, and consequently to exclude, all white persons, except such as are named in the treaty.   Article 15 of the treaty reads as follows:    ''Art. 15.   So far as may be compatible with the constitution of  the United States, and the laws made in  pursuance  thereof, regulating  trade  and intercourse with the Indian tribes, the Creeks and Seminoles shall be secured in the unrestricted right of self-government, and full jurisdiction over persons and property within their respective limits; excepting, however, all white persons,

Creek treaty<br>rights.

with their property, who are not by adoption or otherwise, members of either the Creek or Seminole tribe; and all persons not being members of either tribe, found within their limits, shall be considered intruders, and be removed from and kept out of the same by the United States agents for said tribes respectively (assisted, if necessary, by the military); with the following exceptions. viz: such individuals, with their families, as may be in the employment of the government of the United States; all persons peaceably traveling, or temporarily sojourning in the country, or trading therein under license from the proper authority of the United States; and such persons as may be permitted by the Creeks and Seminoles, with the assent of the proper authorities of the United States, to reside within their respective limits without becoming members of either of said tribes." The last clause of the article of the treaty above set out clearly confers upon the Creek Nation the power of admitting into its territory, with the consent of the proper authorities of the United States, such "other peasons" than those named by it; and, if it has that power, it is equally clear that it may prescribe all reasonable terms upon the compliance of which such persons may be admitted or excluded. More especially so when it is remembered that by the provision of the same treaty it is provided that "so far as compatible with the constitution of the United States and the laws made in pursuance thereof regulating trade and intercourse with the Indian tribes, the Creeks * * * shall be secure in the unrestricted right of self-government; and further, that all such persons as may be in the Creek Nation without the consent of that nation are deemed to be intruders, and pledges itself to remove them." Attorneys practicing in the United States courts are not persons who come within the exceptions, for they are not "in the employment of the government of the United States," or "persons peaceably traveling or temporarily sojourning in the country, or trading

*Removal of intruders.*

therein under license from the proper authority of the United States."

Article 7 of the treaty between the United States and the Choctaw and Chickasaw Nations (11 Stat. 613) is, upon the question here involved, identical with article 15 of the Creek treaty; and the question 'as to whether these nations had the power to enforce their permit laws was passed upon by Atty. Gen. Wayne McVeagh in 1881. He says: "The validity of such permits is recognized by the concluding clause of article 7 of the treaty of June 22, 1855, which is not inconsistent with the terms of the later treaty." 17 Ops. Attys. Gen. 134. Upon the same subject Atty. Gen. Phillips, in 1884, says: "In absence of treaty 'or statutory provision to the contrary, the Choctaw and Chickasaw Nations have power to regulate their own rights of occupancy, and to say who shall participate, and upon what conditions, and hence may require permits to reside in the nations from citizens of the United States, and levy a pecuniary exaction therefor. The clear result of all the cases, as restated in Beecher vs Wetherby, 95 U. S. 526, 24 L. Ed. 442, is, 'The right of the Indians to their occupancy is as sacred as that of the United States to the fee.' I add that, so far as the United States recognize political organizations amongst Indians the right of occupancy is a right in the tribe or nation. It is, of course, competent for the United States to disregard such organizations, and treat Indians individually, but their policy has generally been otherwise. In such cases, presumptively, they remit all questions of individual right to the definition of the nation, as being purely domestic in character. The practical importance here of this proposition is that in the absence of express contradictory provisions by treaty, or by statutes of the United States, the nation, and not a citizen, is to declare who shall come within the boundaries of its occupancy, and under what regulations and conditions. * *
(a) Article 7, 1855, secured to the Choctaws and Chickasaws,

amongst other things, 'the unrestricted right of self-government and free jurisdiction over persons and property within their respective limits, excepting, however, all persons or their property who are not by birth, adoption or otherwise, citizens or members of either tribe,' etc. I submit, that whatever this may mean, it does not limit the right of these tribes to pass upon the question, who (of persons indifferent to the United States, i. e. neither employes, nor objectionable) shall share their occupancy, and upon what terms. That is a question which all private persons are allowed to decide for themselves; and even wild animals, not men, have a certain respect paid to the instinct which in this respect they share with man. The serious words 'jurisdiction' and 'self-government' are scarcely appropriate to the right of a hotel keeper to prescribe rules and charges for persons who become his fellow occupants. It is therefore improbable that the above proposition in the treaty of 1855 has any relation to this plain, natural right and natural instinct of an Indian nation." 18 Ops. Attys. Gen. 36, 37.

We fully agree with these opinions, and hold, therefore, that unless since the ratification of the treaty of 1856 there has been a treaty entered into, or an act of Congress passed, repealing it, the Creek Nation had the power to impose this condition or occupation tax, if it may be so called, upon attorneys at law (white men) residing and practicing their profession in the Indian Territory. And inasmuch as the government of the United States, in the treaty, had declared that all persons not authorized by its terms to reside in the Creek Nation should be deemed to be intruders, and had obligated itself to remove all such persons from the Creek Nation, the remedy to enforce this provision of the treaty was a removal by the United States from the Creek Nation of the delinquent as an intruder. Whether the Creek Nation, since the establishment of courts in the Indian Territory, and the passage of the so-called "Curtis Bill," could

*Indian occupation tax.*

recover the amount specified by the Creek statute by a proper action in the courts, is not necessarily now a question for us to decide, because the treaty provides a remedy; and whether this remedy is exclusive of the courts, or only cumulative, is not material. The superintending control of the Interior Department over the Creeks is nowhere abolished, but on the contrary all recent legislation has confirmed and even enlarged it, leaving all the powers of that department of the government to remove from the Indian Territory for the causes specified by the treaties and the statutes as they existed before that time. The act of Congress approved June 7, 1897 (30 Stat. 83), provides "that on after January 1, 1898, the United States courts in the Indian Territory shall have original and exclusive jurisdiction and authority to try and determine all civil causes in law and equity thereafter instituted, * * * and the laws of the United States and the laws of Arkansas in force in the territory shall apply to all persons therein, irrespective of race, the said courts exercising jurisdiction thereof as now conferred upon them in the trial of like causes." While it is true that this act had the effect of abolishing the courts of the Indian tribes, which of course included those of the Creek Nation, and of relegating all causes of actions to the United States courts for trial, yet the executive and legislative departments of the Indian governments were retained, and the treaty provisions and intercourse laws and other statutes relating to the Indian Territory remained in full force. The full control of the Interior department over these Indian tribes, as they then existed, was not interfered with, nor were the Indian statutes annulled, except in so far as that all jurisdiction was taken from their courts, and transferred to those of the United States. The power to remove intruders for the causes assigned by treaty provisions or statutory law still remains, as before, in the Interior department of the government; and the act of Congress approved June 28, 1898, enti-

tled ''An act for the protection of the people in the Indian Territory, and for other purposes'' (30 Stat. 495; Ind. T. Ann. St. 1899, §§ 57q–57z91), commonly called the "Curtis Bill," from beginning to end recognizes this continued authority of the Interior department, and in many instances enlarges it.

The contention that the Creek Nation is not now an Indian reservation is not tenable. Whatever effect the Curtis bill may have upon the Creeks, it has not yet been carried into operation so far as it changes their title to their lands, or their tribal relations to the United States. The mere fact that the Creeks are at some future time to hold their lands in severalty, instead of in the name of the nation, or in common, is not incompatible with, and does not change, the legislation which gives to them the exclusive right of occupancy of their country; nor can it be successfully maintained that because the United States at one time bought from the tribe of Indians who first occupied that country, thereby extinguishing the then Indian title to this land, and afterwards sold it to the Creeks, giving to them a fee-simple title thereto, therefore it is not in possession of the Creeks as an Indian reservation. When the government, in 1825, bought the lands from the Osages, who occupied them under the "original Indian title," they became a part of the public domain, subject to be appropriated by the government and set aside for Indian reservations, or for any other purpose which it might designate. And by the act of Congress of May 28, 1830 (4 Stat. 411), Congress authorized the President to set it apart for the reception of such tribes of Indians as might be willing to exchange for it the lands where they then resided, and remove upon them. The statute is as follows: "That it shall and may be lawful for the President of the United States to cause so much of any territory belonging to the United States, west of the river Mississippi, not included in state or organized territory, and to which the Indian title

has been extinguished, as he may judge necessary, to be divided into a suitable number of districts, for the reception of such tribes or nations of Indians as may choose to exchange the lands where they now reside, and remove there; and to cause each of said districts to be so described by natural or artificial marks, as to be easily distinguished from every other." Clearly, this is a reservation of so much of the lands as the President might thereafter designate for the purpose set forth in the statute, and pursuant to the statute the change was afterwards made by which the Creeks surrendered their right of occupancy of the lands they then held in Alabama for those which they now possess. The land was conveyed to them with the limitation that they should not alienate it without the consent of the United States. By numerous treaties and statutes, including the intercourse laws, their right to the exclusive occupancy of the country was assured to them. No white men, except such as were allowed to go upon other Indian reservations, were permitted to enter the Creek Nation. By the most solemn pledges, they were to be protected from the intrusion of white men. But, whether strictly an Indian reservation or not, the Creek Nation is so far clothed with sovereign powers as that the treaties made between it and the United States, until abrogated, are binding; and, as already shown, the treaty provides that, as to all but the classes of persons therein designated, the Creek Nation is clothed with the power to admit white men, or not, at its option, which, as we hold, gave it the right to impose conditions. Nor does the fact that congress, by the provision of the Curtis bill, has provided for the creation of cities and towns in this nation, and the extinguishment of the Indian title to the lands embraced within the limits of such municipal corporations, alter the case, because this provision of that bill has not yet been carried into effect. The Indian title to such lands still remains in them, and it is yet their

country.   What effect the provision of  this statute  relating to cities and towns when fully consummated, may  have,  we do not now  decide.

But it is claimed that because congress has enacted  a statute  establishing  United  States  courts in   the  Creek Nation, and as  attorneys  practicing  in   such  courts  are officers thereof, therefore they  are excluded  from the  provisions  of the treaty—First, because  they are officers;  and, second, because, as courts cannot perform  their duties without the aid of attorneys,  they are therefore  a necessary and a constituent part of  it, and if taxed,  they might  refuse  to pay, and leave the country, or be removed therefrom by the agent, and, as every man charged with  crime is entitled  to be  heard  in  the courts  by counsel,  he would  thus be  deprived of this  constitutional  right.   In Ex parte  Yale,  24 Cal. 241, the supreme court say:   ''An officer, as  defined by Webster, is 'a  person who  performs any public .duty.'   An attorney at law  is not such an officer.   And in  our  opinion he is not an officer in the constitutional  sense of the  term, and  does not  hold a  public trust.   On  this point we  agree with Justices  Croker and  Norton in  Cohen vs  Wright,  22 Cal. 293.''   Mr. Justice Platt, in  a case relating to the  oath of an attorney (In  re Oaths  to be  Taken by  Attorneys  & Counselors,  20 Johns. 492), says:  ''The  point is  simply whether an attorney or counselor holds an  office of  public trust, in  the  sense of  the  constitution.  *  *  *  In my judgment, an  attorney or counselor does not hold an  office, but exercises a  privilege or franchise.   As attorneys  or counselors,  they  perform  no duties on behalf of  the government; they  execute no public trust. ''   Cooley Tax'n, 576, says:   Practitioners of law  and medicine are  not uncommonly taxed a specific sum upon  the privilege  of pursuing their calling for a year or other specified  time.   Such a  tax if not a poll tax, and  may  therefore  be  levied  when  poll taxes  are  forbidden.   Sometimes the tax is  graded  by the

*Margin note:* Attorneys not public officers

supposed value of the privilege.   The right to impose an occupation tax on practitioners of law  has been  much contested, as being in effect a  tax  on the privilege of  seeking justice in the courts; but it has nevertheless  been sustained with only faint dissent.''   To the same effect,  see Languille vs State,  4  Tex. ·App. 312;  Simmins vs State, 12 Mo.  271; State vs  Hibbard,  3 Ohio,  63;  Young  vs Thomas,  17  Fla. 170;  Cousins  vs State,  50 Ala. 115;  Wright  vs Mayor,  etc., 54 Ga. 645; Stewart vs Potts, 49 Miss  749; Tied. Lim. 84-101; Weeks, Attys. (2d Ed.) 41.   In Ex parte  Williams, 31  Tex. Cr. R.  262, 20  S. W.  580, 21 L.  R. A.  783, the court say: ''But, conceding  them to be officers,  still that  would be  no ground for exemption from taxation.   *   *   *   But, in the second  place,  the   contention  that the legislature  may cripple or destroy the judicial department is  more plausible than sound.   *   *   *   The objection goes to the  existence of the power, rather than to any  probability of it  exercise. It is, indeed, an objection that could  be urged  against any exercise of the taxing power.   Thus, the  legislature ought not to have the  power to  tax land, for fear it might confiscate;  nor  personal  property,  because  the  tax  imposed might  exceed  its value;  nor any  occupation,  business,  or pursuit, because they  could be taxed  out of existence,  and the  livelihood of many  be destroyed.   *   *   *   There is certainly no force in the  proposition  that by the  imposition of this tax  some  defendant may  be  deprived of  counsel. The presumption is absolute,  says Judge  Deaderick in  the Tennessee 'Lawyers' Tax Cases,'  that all good citizens  will obey their state's  laws and pay the  taxes  imposed.   There will  always be  lawyers  who obey the law and  pay  their occupation taxes.   The person accused of crime will always be within reach of  lawyers in a position  to defend  him  by reason  of having paid  their tax.   Until the  criminal  can show that he has actually been  deprived of legal  counsel by reason of this  occupation  tax, the  lawyer cannot  interpose

this plea, that can only inure to the benefit of the defendant. It is a defense peculiarly personal, and this court would not declare the occupation tax law unconstitutional on the ground that some criminal might be deprived of counsel by reason of the law, although no such case arose or ever will arise. This contention is utterly without foundation, for the reason that this provision was put in the bill of rights, not to operate upon contingencies, but upon actual occurrences; and we have none such here. Many reasons could be urged against this proposition, but it is deemed so frail that it is not necessary to deal with it further than to draw a plain parallel. We might with equal propriety charge the legislature with murder because some person gets snake-bitten, and can get no whisky to drink for it, and dies on account of the legislature imposing an occupation tax on liquor dealers, as to say that a criminal is deprived of the right of appearing by counsel on account of the legislature placing an occupation tax on lawyers, or might with some propriety accuse the legislature with murder because some persons die'on account of a tax on traveling physicians. The cases are about on a par."

We agree with the authorities, and hold that attorneys at law are not relieved from the payment of the amount required by the Creek statute for the privilege of remaining and practicing their profession in the Creek Nation because of the fact that they are lawyers. On the whole case we therefore hold that a lawyer who is a white man and not a citizen of the Creek Nation, is, pursuant to their statute, required to pay for the privilege of remaining and practicing his profession in that nation the sum of $25; that, if he refuse the payment thereof, he becomes, by virtue of the treaty, an intruder, and that in such a case the government of the United States may remove him from the nation; and that this duty devolves upon the interior department. Whether the interior department or its Indian

agents can be controlled by the courts by the writs of mandamus and injunction is not material in this case, because, as we hold, an attorney who refuses to pay the amount required by the statute by its very terms becomes an intruder, whom the United States promises by the terms of the treaty to remove, and therefore in such cases the officers and agents of the interior department would be acting clearly and properly within the scope of their powers.

The complaint challenges the right of the Indian agent to collect this tax, but at the hearing before us this point was waived by appellants in open court, because, as stated by their counsel, the object of the suit was to get a judicial determination of the question as to whether, under the law, they were liable at all. We are of the opinion however that the Indian agent, when directed by the secretary of the interior, may collect this money for the Creeks. The intercourse laws (Rev.. St. U. S. § 2058; Ind. T. Ann St. 1899, § 4268) provide that "each Indian agent shall, within his agency, manage and superintend the intercourse with the Indians, agreeably to law, and execute and perform such regulations and duties, not inconsistent with law, as may be prescribed by the president, the secretary of the interior, the commissioner of Indian affairs or superintendent of Indian affairs." In this case the Indian agent was acting in strict accordance with directions and regulations of the secretary of the interior, in a matter clearly relating to intercourse with the Indians. And when it is remembered that up to the time that the United States courts were established in the Indian Territory the only remedy for the collection of this tax, was by removal, and that the Indian Nations had no power to collect it, except through the intervention of the interior department, it is quite clear that if, in the best judgment of that department, it was deemed wise to take charge of the matter, and collect

*Collection of Indian tax by U. S. officials.*

(18)

this money, and turn it over to the Indians, it had the power to do so, under its superintending control of the Indians, and the intercourse of white men with them granted by various acts of congress; and in our opinion that power has not been taken away by any subsequent act of congress, or treaty stipulation. The decree of the court below, sustaining the demurrer to the complaint and dismissing the case, is affirmed.

TOWNSEND and GILL, JJ., concur.