UNITED STATES v. CADZOW et al.

(Fourth Division. Fairbanks. May 16, 1914.)

No. 1953.

1. INDIANS ⊜⟶10—PUBLIC LANDS.
    The aboriginal tribes of Alaska have a right to occupy the public lands of the United States therein subject to the control of both the lands and the tribes by the United States.

2. INDIANS ⊜⟶6—RIGHTS IN ALASKA.
    The uncivilized native tribes of Alaska are wards of the government; the United States has the right, and it is its duty, to protect the property rights of its Indian wards.

3. INDIANS ⊜⟶15(1)—PUBLIC LANDS—TRESPASS.
    The defendants purchased the improvements of an Indian residing on the public lands and entered upon the same and claimed a right of possession thereof in a suit brought by the United States to recover possession. *Held*, defendant did not acquire any right whatever to the land by his purchase from the Indian, and can be removed therefrom at the suit of the United States as a trespasser.

4. INDIANS ⊜⟶10—PUBLIC LANDS—INJUNCTION.
    The United States has guaranteed to the Indians in Alaska the right to the occupancy and possession of the lands occupied by them when the Acts of Congress of May 17, 1884 (23 Stat. 24, c. 53), March 3, 1891 (26 Stat. 1095, c. 561), May 14, 1898 (30 Stat. 412, c. 299), and June 6, 1900 (31 Stat. 330, c. 786), were passed.

The district attorney for this division, under authority from, and by the direction of, the Attorney General of the United States, began this action to enjoin the defendants from entering or trespassing upon a certain tract of land, situate upon the north bank of the Yukon river at a place known as Ft. Yukon, alleging, in effect, that the tract in question was public land of the United States, and that the St. Stephen's Mission of the Protestant Episcopal Church in the United States had made application for patent therefor, which was pending before the land office, for itself and for a band of Indians residing on this land; that the mission and the Indians resident there were entitled to the possession of the land, and that

⊜⟶See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the defendants were conspiring together to deprive them of such possession, and were threatening to and were about to, enter into the possession thereof, to the injury of the said occupants and of the United States.

The history of the occupation of these lands, since 1862 to the present time, was recited at some length in the complaint, and in affidavits filed at the same time, and thereupon a preliminary injunction was issued, restraining the defendants from trespassing or entering upon the tract in question, and directing them to show cause at a certain time why such injunction should not be made permanent. At the return day the defendants Horton and Moore appeared, the other defendants being in default, and the preliminary injunction was continued until the final hearing. The case was tried upon the plaintiff's complaint and the answer of these two defendants, and evidence introduced at the trial.

The answer of these defendants denied generally most of the allegations of the complaint, but admitted that the tract of land was public land of the United States, and that they had entered into possession of a certain part thereof in 1907, having at that time purchased a cabin from an Indian resident thereon; that they had occupied this building since that date, and had inclosed a small tract of land adjacent thereto, and erected buildings thereon, in which they had been and were conducting a large mercantile business; that these buildings were situate close to the bank of the river, and that this bank was being washed away, and that it would soon be necessary for them to remove their buildings further back from the river bank, or construct new buildings further back from the river, and that it was their purpose to construct other buildings a few hundred feet distant from their present location, and upon lands described in the complaint. They also set up as affirmative defenses, first, that the plaintiff was estopped from maintaining the action, because in the year 1909 Bishop Peter Trimble Rowe, in charge of the mission at that time, disclaimed any right on behalf of the mission, and of the Indians under his charge, to the lands occupied by these defendants, and also to the lands whereon they were about to construct other buildings; second, that the buildings now occupied by them were jeopardized by the washing away of the bank of the river, and that it was necessary for them, in

order to protect their property, to remove their store and warehouses to the site selected by them, and that such site is upon vacant and unappropriated land of the United States, and not in the possession of, or claimed by, any natives of the Indian village, or any other person or persons; and, third, that the site so selected by these defendants, and about to be built upon, was in close proximity to land formerly used by the United States army and the United States custom house, and that since 1901 such buildings had been torn down and abandoned, and the land left unoccupied.

The plaintiff moved to strike from the files the entire answer of the defendants, and this motion was undecided at the time of the final hearing.

So far as the denials contained in the answer are concerned, they raise an issue; but the so-called affirmative defenses clearly set up no matters constituting any defense to the cause of action, and are disregarded.

The evidence was somewhat contradictory in certain respects, but it fairly appears therefrom that upon, or close to, the tract in question, the Hudson's Bay Company established a trading post about the year 1862, and that the Indians of the surrounding country began to make their headquarters near this post soon thereafter, and that probably it had been occupied to a certain extent by the Indians prior thereto; that about this time, also, the Protestant Episcopal Church of England established a mission there for the benefit of the Indians. The trading post was continued by the Hudson's Bay Company until after the cession of Alaska to the United States by Russia in 1867, when it was removed to Rampart House, in Canadian territory. In 1896 or 1897 the Protestant Episcopal Church in the United States of America took over the mission, and has maintained a mission there ever since, and has expended a considerable sum of money in erecting buildings for a church, school, hospital, and general mission purposes. In 1905 the application of the Domestic & Foreign Missionary Society of this church for a patent for the land was filed in the United States land office at Juneau, and the following year the lands were surveyed, under the direction of the Secretary of the Interior, but only 2.91 acres were included in the survey, although the application was for 640 acres. It seems, also, that an application had been made in 1901, but

no action ever taken in the matter. Nor has final action upon this latter application been taken by the land office.

In 1892 a trading post was established by one Beaumont close to the mission grounds, and this post has ever since been maintained. About 1896 or 1897 the North American Transportation & Trading Company established a trading post not far from the Beaumont post, and maintained it for some years. Some of its buildings were subsequently acquired by the mission. During the winter of 1896 and 1897 there was considerable increase in the population adjoining this place, by reason of two boats being compelled to remain there in winter quarters, and several cabins were constructed close to the river bank, and occupied by government officials and other white men; but these seem all to have disappeared, and the ground whereon they stood to have been washed into the river, before the commencement of this action. · For some time the total white population of this vicinity seems to have been from 10 to 15 persons, and a native population of from 150 to 400 Indians; the white population consisting of those connected with the mission and government school, and traders, augmented at times by transient trappers and prospectors. The number of Indians residing there varied at different times during each year, but a large part of this number had homes here and made the place their headquarters, being absent at different times during the year, following their pursuits of hunting, trapping, and fishing. The lands occupied by the Indians were not altogether segregated from those occupied by the whites, but generally it may be said that the buildings of the white people occupied two distinct parts of the tract; the mission and trading site of Beaumont being at the lower part, the Indian village immediately upstream from this, and some other buildings occupied by white people further upstream from the lands occupied by the Indians. A portion of the land between the two different parts occupied by the buildings of the white people was low, and occupied by Indians only at certain times during the summer, when they had tents thereon and used it as a landing place for their boats. There was considerable evidence to the effect that the presence of the white population had a demoralizing influence upon the Indians, and it is contended on the part of the government that their presence added considerably to the cost of

enforcing the criminal laws of the district. It appeared that a number of the defendants, besides Horton and Moore, had either begun the construction of buildings, or were about to begin such construction, on the lands claimed by the Indians as a part of their village, although not actually occupied by any Indians. It also appeared that most of this ground had been occupied by Indians, to a greater or less extent, since 1862, and particularly since 1897; that their cabins were situated at irregular distances from each other, without inclosures around the cabins for the most part; that no streets were regularly laid out across the tract, and that a considerable part thereof was entirely unoccupied, but was used more or less by the Indians going from one cabin to another, and to the river, which was their source of water supply, and the banks of which were used as a landing place for their boats, and in connection with their fishing; and that the Indians had claimed the right to the use and occupation of this part of the tract at least since about 1898, and that such right had been generally respected prior to the time the defendants in this action began making preparations to construct buildings thereon. It did not appear that any of the defendants had made any attempt to secure title to any of the land, under any of the laws of the United States relating to public lands, nor that they asserted any rights other than the assumed right to occupy vacant, unappropriated public land of the United States.

J. J. Crossley, U. S. Dist. Atty., of Portland, Or., for the United States.

McGowan & Clark, of Fairbanks, for defendants.

FULLER, District Judge. The rights of the Indians generally in the United States to the occupancy of lands have been considered by various courts in a number of instances, and it is generally conceded that the aboriginal inhabitants of the country had the right to such occupancy, although the paramount title is vested in the government; that such right of occupancy is good as against all others except the government, but that it is not of a nature to prevent the government from dealing with the title as it may see fit. In an early case the nature and rights of the title of Indians to lands in the United States were exhaustively considered by Chief Justice

5 A.R.—9

Marshall, and the following principle declared to be unquestioned:

"That the Indian inhabitants are to be considered merely as occupants, to be protected, indeed, while in peace, in the possession of their lands, but to be deemed incapable of transferring the absolute title to others. However this restriction may be opposed to natural right, and to the usages of civilized nations, yet, if it be indispensable to that system under which the country has been settled, and be adapted to the actual condition of the two people, it may, perhaps, be supported by reason, and certainly cannot be rejected by courts of justice.   *   *   *   It has never been contended that the Indian title amounted to nothing. Their right of possession has never been questioned. The claim of government extends to the complete ultimate title, charged with this right of possession, and to the exclusive power of acquiring that right." Johnson v. McIntosh, 8 Wheat. 543, 5 L. Ed. 681.

It has also been determined in numerous cases that the Indians are wards of the government, and that it is the duty of the government to protect them as such. In a case in the Supreme Court, decided October 20, 1913, in which such rights were considered, the court says:

"Not only does the Constitution expressly authorize Congress to regulate commerce with the Indian tribes, but long-continued legislative and executive usage and an unbroken current of judicial decisions have attributed to the United States as a superior and civilized nation the power and the duty of exercising a fostering care and protection over all dependent Indian communities within its borders, whether within its original territory or territory subsequently acquired, and whether within or without the limits of a state. As was said by this court in United States v. Kagama, 118 U. S. 375, 384, 6 Sup. Ct. 1109, 30 L. Ed. 228, 230: 'The power of the general government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never existed anywhere else, because the theater of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes.' " United States v. Sandoval, 231 U. S. 28, 34 Sup. Ct. 1, 58 L. Ed. 107.

And in the case last cited it is held that courts of the United States, rather than state courts, are vested with jurisdiction to determine and protect the rights of Indians:

"These Indian tribes are the wards of the nation. They are communities dependent on the United States; dependent largely for their daily food; dependent for their political rights. They owe no

allegiance to the states, and received from them no protection. Because of the local ill feeling, the people of the states where they are found are often their deadliest enemies. From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the executive and by Congress, and by this court, whenever the question has arisen." United States v. Kagama, 118 U. S. 383, 6 Sup. Ct. 1109, 30 L. Ed. 228.

The rights of the Indians, and the duty of the United States to protect such rights, have been considered also in the following cases: Caldwell v. Robinson (C. C.) 59 Fed. 653; Robinson v. Caldwell, 67 Fed. 391, 14 C. C. A. 448; Beck v. Flournoy L. & R. Co., 65 Fed. 30, 12 C. C. A. 497; United States v. Boyd (C. C.) 68 Fed. 577; United States v. Flournoy L. & R. Co. (C. C.) 71 Fed. 576; Beecher v. Wetherby, 95 U. S. 517, 24 L. Ed. 440; United States v. Winans (C. C.) 73 Fed. 72; United States v. Boyd, 83 Fed. 547, 27 C. C. A. 592; Maxey v. Wright, 3 Ind. T. 243, 57 S. W. 809; Nagle v. U. S., 191 Fed. 141, 111 C. C. A. 621; Peters v. Malin (C. C.) 111 Fed. 250; McGrath v. Valentine, 167 Fed. 477, 93 C. C. A. 109; Lemmon v. U. S., 106 Fed. 651, 45 C. C. A. 518; Young v. Goldsteen (D. C.) 97 Fed. 303.

The status and rights of Indians in Alaska have been fully considered in an opinion delivered by Judge Wickersham in 1905, in the case of United States v. Berrigan, 2 Alaska, 443, and but little need be added to what is therein said.

The treaty ceding Alaska to the United States provided:

"That the uncivilized tribes will be subject to such laws and regulations as the United States may from time to time adopt in regard to aboriginal tribes of that country."

The following acts of Congress each contain a provision protecting the Indians in Alaska in the use and occupancy of lands claimed by them:

An act to provide a civil government for Alaska, approved May 17, 1884. 23 Stat. 24.

An act to repeal timber culture laws, and for other purposes, approved March 3, 1891. 26 Stat. 1095.

An act extending homestead laws and providing for right of way for railroads in the district of Alaska, and for other purposes. Approved May 14, 1898. 30 Stat. 412.

An act making further provision for a civil government for Alaska, and for other purposes, approved June 6, 1900. 31 Stat. 330.

The provision, in each of these acts referred to, was designed to protect the Indians in the occupancy of lands held by them at the time of passage of the several acts; and the rights of missions to occupy public lands, and to secure title therefor, are also recognized.

"The land not exceeding six hundred and forty acres at any station now occupied as missionary stations among the Indian tribes in said section, with the improvements thereon erected by or for such societies, shall be continued in the occupancy of the several religious societies to which said missionary stations respectively belong until action by Congress."

"All tracts of land not exceeding 640 acres in any one tract now occupied as missionary stations in said district of Alaska, are hereby excepted from the operation of the last three preceding sections of this act."

"The Indians or persons conducting schools or missions in the district shall not be disturbed in the possession of any lands now actually in their use or occupation, and the land, at any station not exceeding six hundred and forty acres, now occupied as missionary stations among the Indian tribes in the section, with the improvements thereon erected by or for such societies, shall be continued in the occupancy of the several religious societies to which the missionary stations respectively belong, and the Secretary of the Interior is hereby directed to have such lands surveyed in compact form as nearly as practicable and patents issued for the same to the several societies to which they belong; but nothing contained in this act shall be construed to put in force in the district the general land laws of the United States."

Comp. Laws Alaska 1913, pp. 118, 119.

It appears that no action has ever been taken by the Department of the Interior to set apart any special lands for Indian occupancy in Alaska, under the provisions of the section above quoted, and, as stated heretofore, the application of the St. Stephen's Mission for a part of the tract in controversy is still pending in the land office.

In the report of the United States deputy surveyor who surveyed the mission tract at Ft. Yukon, in explanation of his action in surveying only 2.91 acres, instead of 640 acres, as applied for by the mission, he says:

"I questioned the Indians throughout the village, and they in nearly every instance said they came to Ft. Yukon at the time that Beaumont came, which was in 1892. At any rate, the Indians have built houses over most of the ground along the water front and claim the land as their own. * * * For the foregoing reason the tract was not surveyed as large as was requested by Bishop Rowe. To

extend the lines would be to encroach on lands claimed by natives and others."

Whether or not the part of the act of June 6, 1900, above quoted, contemplates that patent should issue to the religious society to which the missionary station belongs, for the entire tract, not exceeding one mile square, occupied by it and by the Indians, for the benefit jointly of the mission and Indians, or whether, as interpreted by the surveyor of this tract, it contemplates that a patent should issue to the missionary society for only such lands as are actually occupied by it, and the rights of the Indians should be separately considered, and the Department of the Interior issue a patent to them separately, it is not necessary to determine. At any rate, the government, by the acts above mentioned, has guaranteed to the Indians the right to remain in the occupation of the lands occupied by them at the time the several acts were passed. There is no question but that a considerable number of these Indians were in the occupation of these lands at the time of the passage of the act of June 6, 1900. I am satisfied that they reasonably require for their use all the lands between the mission buildings and the store of McInroy & Foster, and extending from the water front back a distance of one-half mile.

Under the authority of United States v. Berrigan, supra, and other cases cited, the defendants Horton & Moore, by purchasing a cabin of an Indian occupant, did not acquire any title whatever thereto, and could be removed therefrom at the suit of the United States, if such action were deemed advisable.

The government does not ask that any white people now occupying any part of this tract be removed therefrom, but simply that no further encroachments be allowed; and a permanent injunction, granting such relief, may be entered. The United States undoubtedly had the right to institute and maintain this action, for the protection of either the Indians or the mission, or both. A decree may be entered, enjoining the defendants from entering or trespassing upon the part of the lands last mentioned, and from interfering with the Indians or the mission in their occupancy thereof.