BUSTER & JONES ET AL VS WRIGHT ET AL.

Opinion delivered October 19, 1904.

1. *Indian Laws—License Fees for Traders a Tax not a Debt—Payment Enforceable by Interior Department.*

Under the provisions of the Treaty of 1856 between the United States and Creek Nation giving the latter unrestricted right of self-government and full jurisdiction and control over all persons and property within the limits of their Nation and authorizing the removal therefrom, by the agents of the Interior Department, of all intruders, these including traders failing to pay license fees, a tax collector, acting under the direction and as the agent of the Interior Department, has the right to close the places of business of merchants in the Creek Nation refusing to pay the license fee prescribed by the Nation, the fee being a tax and not a debt.

2. *Indian Laws—Taxes and Royalties—U. S. Courts no Jurisdiction to Collect.*

The United States Courts in the Indian Territory have no jurisdiction to collect taxes for the Creek Nation.
CLAYTON, J., Dissenting.

Appeal from the United States Court for the Western District.

CHAS. W. RAYMOND, Judge.

Action by Buster & Jones and others against J. George Wright and others. Judgment dismissing the complaint. Plaintiffs appeal.     Affirmed.

On August 23, 1901, the appellants (plaintiffs below) filed their complaint in equity against the appellees (defendants below), asking for a temporary restraining order enjoining the defendants, among other things, from closing up the places of business of plaintiffs, or in any other manner interfering with plaintiffs.     The plaintiffs alleged that one Cobb, an alleged tax collector for the Creek Nation, Ind. Ter., acting under the direction of the Secretary of the Interior, through the orders issued by the Indian inspector for the Indian Territory, notified the firm doing business under the name of the Wagoner Hardware Company, one of the plaintiffs, that, unless they paid a certain sum demanded as a tax for the privilege of doing business as merchants in the Creek Nation, he would close their place of business; that he also made the same threats to the other plaintiffs.     The plaintiffs alleged the tax was illegal and unjust, and levied without authority of law, for reasons set forth in said complaint. On August 27, 1901, defendants filed their demurrer, and on same day both plaintiffs and defendants agreed by stipulation that the case be submitted on the facts therein set forth, and on same day the court, Judge Gill presiding, rendered its decision as follows: "Now, on this 27th day of August, A. D. 1901, comes on to be heard the above-entitled cause upon the demurrer of the defendants to the complaint of the plaintiffs; it being agreed by written, signed stipulation between the parties thereto that in determining said demurrer the court shall take into consideration said stipulation, the same as if the acts set forth in said stipulation had been incorporated in said bill of complaint.     And the court, after hearing the argument of the parties, and being fully

advised in the premises, doth sustain said demurrer; and, said plaintiffs refusing to plead further, it is by the court ordered, adjudged, and decreed that said defendants have judgment, and that said plaintiffs take nothing by their prayer. To all of which said plaintiffs in open court at the time duly excepted, and still except, and pray an appeal, which is allowed by the court."

On December 31, 1902, in the court at Wagoner, in the Western District of the Indian Territory, the plaintiffs presented the mandate of the Court of Appeals of the Indian Territory in this case, and asked the same to be spread on the records of this court, which was granted. Said mandate is as follows: "Be it remembered that at a term of the Court of Appeals in the Indian Territory begun and held at the courthouse in the city of South McAlester on the 23d day, being the fourth Tuesday, of September, A. D. 1902, amongst others, were the following proceedings, to wit: On the 25th day of September, A. D. 1902, a day of said term: Buster & Jones et al., Appellants, vs J. George Wright et al., Appellees. Appeal from the Court of the Northern District of the Indian Territory. This case came on to be heard upon the transcript of the record of the court for the Northern District of the Indian Territory, and was argued by counsel, on consideration whereof it is the opinion of the court that there is error in the proceedings and judgment of said court for the Northern District in this cause, in this: the court below erred in sustaining the demurrer to the complaint filed by the defendants. It is therefore considered by the court that the judgment of said court for the Northern District in this cause rendered be, and the same is hereby, for the error aforesaid, reversed, annulled, and set aside, with costs, and that this cause be remanded to said court for the Northern District for further proceedings to be therein had according to law, and not inconsistent with the opinion herein delivered."

On March 10, 1903, the defendants filed their answer to the complaint in this cause, and admitted that said Cobb, acting

in the capacity alleged, made the demand of said hardware company "that, unless a certain sum of money due the Creek Nation for a license or permit to transact business in the Creek Nation was paid by a certain day, he would close up the place of business of the said Wagoner Hardware Company, and prevent said company from further conducting their said business;" admit the same demand was made of each of the other plaintiffs; deny that the tax levied by the Creek Nation is illegal and unjust, and that the same was levied without authority of law; deny the other allegations of said complaint; and allege that on November 25, 1900, the Creek Nation passed an act, which was approved by the President of the United States, requiring permits to be secured for the transaction of business within the limits of the Creek Nation by persons who are not citizens thereof, which, in part, is as follows:

"Section 1. That all persons who are not citizens by blood of the Muskogee Nation, or who have not been adopted by the Muskogee Nation, and whose names do not appear on authenticated rolls of the Muskogee Nation, who shall desire to engage in any manner of business in the Muskogee Nation, shall obtain the consent of the United States government, and shall pay to the United States Indian agent, at Union Agency, Muskogee, Indian Territory, for the benefit of the Muskogee Nation, the annual permit tax hereinafter fixed; the same to be paid quarterly, in advance in all cases, except where based on the cost of goods offered. Quarters to begin January first, April first, July first and October first of each year. All legitimate business houses of whatever character or capacity engaged in the sale of all manner of dry goods, groceries, provisions, hardware, lumber, drugs, millinery, leather goods, or any other articles known or designated as merchandise, shall pay an annual tax of one-half of 1 per cent. of the first cost of all goods offered for sale, excepting such goods as have been actually produced in the Muskogee Nation,

or shall have been brought within the limits of the nation, from traders who shall have previously paid this tax of one-half of 1 per cent. of such goods; all.payments to be accompanied by sworn .statements, said statements to be verified by personal inspection by a proper inspector of the original invoices or the books of the trader.   *   *   *

"Section 3.   This act shall become a law upon the approval of the President of the United States, and shall be in full force and effect from and after January first, 1901.   All laws heretofore enacted by the National Council of the Muskogee Nation, relating to permit tax which are in conflict with this act, are hereby repealed."

They further allege "that by virtue of the laws of the Creek or Muskogee Nation above set forth, and the laws of the United States governing the power and authority of the Secretary of the Interior in relation to such matters as are involved in this action, the said Secretary of the Interior proceeded to collect the revenues due the Creek or Muskogee Nation by, through and with the assistance of the defendants in this action, who are at all times acting under the authority of the said Secretary of the Interior; that the Secretary of the Interior, by virtue of the authority vested in him by law, prescribed certain rules and regulations which were duly transmitted to the United States Indian inspector and the United States Indian agent, defendants herein, providing the manner of collecting the revenues due the Creek Nation aforesaid; that sections 13 and 14 of the rules and regulations of the Secretary of the Interior governing mineral leases, the collection and disbursement of revenues and the supervision of schools in the Indian Territory issued at Washington November 4, 1898, are as follows, to wit:

" 'Section 13.   The said United States Indian agent shall receive and receipt for all royalties paid into his hands when

accompanied by the sworn statement as provided in the preceding regulation, but not otherwise, and it shall also be his duty to collect under the supervision and direction of the United States Indian inspector for the Indian Territory, all rents, permits, revenues and taxes of whatsoever kind or nature that may be due and payable to any Indian tribe or tribes to which these regulations may apply as provided for by the laws of such tribe or tribes.

" 'Section 14. The rents, permits, taxes and revenues provided for by the foregoing regulation to be collected by the United States Indian agent shall be due and payable to him in lawful money of the United States at the time when such rents, permits, taxes and revenues would, under the laws of the particular nation, have been due and payable to the authorities of such nation had not the act of June 28, 1898, and especially section 16 thereof, been passed."

They further allege that the Secretary of the Interior requested an opinion from the Attorney General of the United States "as to the duties, power, and authority of this department in the matter of the collection of permit taxes imposed by the laws of the respective Indian nations in the Indian Territory, known as the 'Five Civilized Tribes,' upon noncitizens engaged in various pursuits within the territorial limits of such nations," and requested said Attorney General to answer, among others, the following question: "Has it authority, in the case of a merchant refusing to pay such tax, to close his place of business, or to remove his stock of merchandise beyond the limits of the Nation?" On September 7, 1900, the Attorney General rendered his opinion, in which he held that it is the duty of the Interior Department "to close all business which requires a permit or license, and is being carried on there without one."

Defendants further allege that under and by virtue of the laws of the United States, the laws of the Creek Nation, and the rules, regulations, and instructions of the Secretary of the Interior, they had power and authority to collect from the plaintiffs herein the sums demanded for permission to conduct their respective occupations or business enterprises within the limits of the Creek or Muskogee Nation, and that in collecting said sums of money said defendants last above named, or either or all of them, had authority and power to close the business houses of the said plaintiffs; the said plaintiffs not having procured from the Creek or Muskogee Nation permits to carry on said business enterprises. Said defendants, further answering, say that this court is without jurisdiction to control the actions of these defendants, or either of them, in carrying out the laws of the United States, the laws of the Creek Nation, and the rules and regulations and instructions of the Secretary of the Interior in the collection of the sums of money demanded for permission to conduct the various business. enterprises of plaintiffs within the limits of the Creek or Muskogee Nation. And these defendants deny that said plaintiffs are entitled to any writ of injunction restraining these defendants from proceeding to collect the sums of money aforsaid, or from closing the places of business of the plaintiffs herein, or from any other act in collecting the money aforesaid, and ask to be dismissed, with costs. On March 25, 1903, plaintiffs filed their demurrer to the answer of defendants.

On August 19, 1903, the parties, by their attorneys, filed their stipulation in this cause, which is as follows: "Stipulation. It is hereby stipulated and agreed by and between the parties plaintiff and Maxey & Hunt, their attorneys of record, and the parties defendant and their attorney of record, William M. Mellette, United States Attorney, that this cause be submitted to the court for final hearing upon the complaint and answer filed herein. And there being no dispute between the plaintiffs and

defendants as to the facts in this case, it is hereby agreed that the several allegations of fact in the complaint be taken as true, and the several laws of the Creek Nation and the several regulations of the Secretary of the Interior set forth therein are true copies of the original laws of the Creek Nation, and the original regulations of the Department of the Interior duly promulgated. Maxey & Hunt, Attorneys for plaintiffs. Wm. M. Mellette, U. S. Attorney and Attorney for Defendants."

On same day, this cause coming on to be heard, the court rendered the following decree: "And now, on this 19th day of August, 1903, come the above-named defendants, by William M. Mellette, their attorney, and the United States attorney, and withdraw demurrer to the complaint of plaintiffs heretofore filed. Come also the above-named plaintiffs, by their attorneys, Maxey & Hunt, and withdraw demurrer to answer heretofore filed. And come the parties plaintiff and defendant, by their respective attorneys above set forth, and submit this cause for final hearing upon the complaint and answer and upon the stipulation of facts this day filed herein. And the court, after due consideration of law and the facts, doth find the issues of law and issues of fact for the defendants. Whereupon it is ordered by the court that the bill of plaintiffs be dismissed for want of equity, and that the defendants have and recover of the said plaintiffs their costs laid out and expended in this cause, and that the application for injunction be denied." To which plaintiffs excepted, and appealed to this court.

*Maxey & Hunt*, for appellants.

*Leslie C. Fuller* and *W. M. Mellette*, for appellees.

TOWNSEND, J. The appellants have filed assignments of error as follows: "(1) The court erred in dismissing plaintiffs'

bill, and not complying with the mandate of the court of appeals (2)   The court erred in holding that the defendants had a right to collect the taxes imposed by the Creek Nation upon the plaintiffs and others similarly situated.   (3)   the court erred in holding that the defendants had a right to close up the places of business of the plaintiffs, and remove them from the Indian Territory if they attempted to reopen.   (4)   The court erred in refusing to obey the mandate of the Court of Appeals of the Indian Territory, and, in effect, attempting to overrule the Court of Appeals.   (5)   The court erred in passing on the merits of the case when there was nothing before it that was not in the case as previously submitted to the Court of Appeals, and the Court of Appeals had directed it to proceed with the case in accordance with law, and not inconsistent with the opinion of the Court of Appeals."

Article 15 of the treaty of 1856 between the United States and the Creek Nation (11 Stat. 703) provides as follows: "Treaty of 1856.   Art. 15.   So far as may be compatible with the Constitution of the United States, and the laws made in pursuance thereof, regulating trade and intercourse with the Indian tribes, the Creeks and Seminoles shall be secured in the unrestricted right of self-government, and full jurisdiction over persons and property, within their respective limits; excepting, however, all white persons with their property, who are not, by adoption or otherwise, members of either the Creek or Seminole tribe; and all persons not being members of either tribe, found within their limits, shall be considered intruders, and be removed from and kept out of the same by the United States agents for said tribes, respectively (assisted, if necessary, by the military); with the following exceptions, viz: Such individuals with their families as may be in the employment of the government of the United States; all persons peaceably traveling, or temporarily sojourning in the country, or trading therein under license from the proper

authority of the United States; and such persons as may be permitted by the Creeks or Seminoles, with the assent of the proper authority of the United States, to reside within their respective limits without becoming members of either of said tribes."

In Maxey et al vs Wright, 3 Ind. Ter. Rep. 243, (54 S. W. 807), this court, in affirming the judgment of Judge Thomas, quoted as follows (page 809): "Article 7 of the treaty between the United States and the Choctaw and Chickasaw Nations (11 Stat. 613) is, upon the question here involved, identical with article 15 of the Creek treaty; and the question as to whether these nations had the power to enforce their permit laws was passed upon by Atty. Gen. Wayne McVeagh in 1881.   He says: 'The validity of such permits is recognized by the concluding clause of article 7 of the treaty of June 22, 1855, which is not inconsistent with the terms of the later treaty.   17 Ops. Attys. Gen. 134.   Upon the same subject, Atty. Gen. Phillips, in 1884, says: 'In the absence of treaty or statutory provision to the contrary, the Choctaw and Chickasaw Nations have power to regulate their own rights of occupancy, and to say who shall participate, and upon what conditions, and hence may require permits to reside in the nations from citizens of the United States, and levy a pecuniary exaction therefor.   The clear result of all the cases, as restated in Beecher vs Wetherby, 95 U. S. 526, 24 L. Ed. 442, is, 'The right of the Indians to their occupancy is as sacred as that of the United States to the fee.' *   *   * We fully agree with these opinions, and hold, therefore, that unless since the ratification of the treaty of 1856 there has been a treaty entered into, or an act of Congress passed, repealing it, the Creek Nation had the power to impose this condition or occupation tax, if it may be so called, upon attorneys at law (white men) residing and practicing their profession in the Indian Territory.   *   *   *   We are of the opinion, however, that the

Indian agent, when directed by the Secretary of the Interior, may collect this money for the Creeks. The intercourse laws (Rev. St. U. S. § 2058; Ind. Ter. St. 1899, § 4268) provide that 'each Indian agent shall, within his agency, manage and superintend the intercourse with the Indians, agreeably to law, and execute and perform such regulations and duties, not inconsistent with law, as may be prescribed by the President, the Secretary of the Interior, the Commissioner of Indian Affairs, or Superintendent of Indian Affairs.' In this case the Indian agent was acting in strict accordance with directions and regulations of the Secretary of the Interior, in a matter clearly relating to intercourse with the Indians. And when it is remembered that up to the time that the United States courts were established in the Indian Territory the only remedy for the collection of this tax was by removal, and that the Indian nations had no power to collect it, except through the intervention of the Interior Department, it is quite clear that if, in the best judgment of that department, it was deemed wise to take charge of the matter and collect this money and turn it over to the Indians, it had the power to do so, under its superintending control of the Indians, and the intercourse of white men with them granted by various acts of Congress; and, in our opinion that power has not been taken ' away by any subsequent act of Congress or treaty stipulation. The decree of the court below, sustaining the demurrer to the complaint and dismissing the case, is affirmed."

In Buster et al vs Wright et al., 4 Ind. Ter. Rep. 300 (69 S. W. 822) this court, in reversing the judgment of Judge Gill on the former appeal of this case, says: "As to the power of the Interior. Department of the United States government to remove white men from the Indian Territory who refuse to pay such amounts as may be required by the laws of the Creek Nation for the privilege of being permitted to come into that nation and to engage in business therein, we simply refer to the case of Maxey

vs Wright (heretofore decided by us, and which was affirmed by the United States Circuit Court of Appeals for the Eighth Circuit,) 3 Ind. Ter. Rep. 243, (54 S. W. 807). In that case we decided the question against the contention of the plaintiffs, and, if this were the only ground alleged in the complaint for an injunction, the action of the court below in sustaining the demurrer would be upheld. But the threat to remove plaintiffs from the Indian Territory was not the principal ground set up in the complaint. It was "that unless they (plaintiffs) paid a certain sum demanded, * * * by one o'clock of that day, they would close up their place of business, and, if they attempted to open up their said places of business, that they (plaintiffs) would be reported by the Indian inspector to the Secretary of the Interior, and an order asked for their removal from the Indian Territory, to prevent them from doing business any further until they paid the sum demanded.' * * * While by the treaty and the statutes the Secretary of the Interior may find the fact that a man is an intruder in the Creek Nation, because he fails to comply with the conditions upon which he was permitted to enter, and put him out, he cannot collect the debt by closing his place of business. The one is the enforcement of a penalty for being an intruder; the other, if allowed, would be the means of collecting a debt. The one, the law provides for; the other, it does not. We know of no provision of treaty or statute law providing or such a remedy to be enforced by the Interior Department of the government. * * * Since the entry of the decree in the court below, Congress, by act approved May 27, 1902, c. 888, 32 Stat. 259, has provided 'that it shall hereafter be unlawful to remove or deport any person from the Indian Territory who is in lawful possession of any lots or parcels of land in any town or city of the Indian Territory which has been designated as a town site under existing laws or treaties.' The complaint, in effect, alleges that Wagoner has been so designated, and that

the plaintiffs are in lawful possession of lots therein; and as we hold that the property of the plaintiffs cannot be seized, and the doors of their business houses closed, and as the act referred to provides that the plaintiffs cannot be removed or deported from the Indian Territory, it follows that the only method left for the collection of the debt is through the ordinary channels of the courts."

It thus appears that, while this court sustained the right of the Secretary of the Interior 'to remove white men from the Indian Territory who refuse to pay such amounts as may be required by the laws of the Creek Nation for the privilege of being permitted to come into that nation and to engage in business therein, we held in Buster et al vs Wright et al., supra, that the Secretary of the Interior 'cannot collect the debt by closing his place of business." ' It would seem, upon reflection, that, perhaps, when we spoke of this license fee for this privilege of doing business as a debt, we were inaccurate, as it is not a debt. In Crabtree vs Madden, 54 Fed. 431, 4 C. C. A. 408, the court say: "The counsel for plaintiffs attempts to escape from this conclusion by the argument that this tax is a debt; that it arises upon an implied contract; that the court has jurisdiction to enforce such contracts, and hence of this action. This position is not tenable. Taxes are not debts. They do not rest upon contract, express or implied. They are imposed by the legisative authority, without the consent and against the will of the persons taxed, to maintain the government, protect the rights and privileges of its subjects, or to accomplish some authorized special purpose. They do not draw interest, are not subject to set-off, and do not depend for their existence or enforcement upon the individual assent of the taxpayers. Meriwether vs Garrett, 102 U. S. 472, 513, 26 L. Ed. 197; Lane County vs Oregon, 7 Wall. 71, 80, 19 L. Ed. 101; In re Duryee (D. C.) 2 Fed. 68; Peirce vs Boston, 3 Metc. (Mass.) 520; Perry vs Wash-

burn, 20 Cal. 318; Webster vs Seymour, 8 Vt. 135, 140; Johnson vs Howard, 41 Vt. 122, 125, 98 Am. Dec. 568."

The appellees in this case were acting under the orders of the Secretary of the Interior in closing the stores of appellants, who were "traders in the Creek Nation without license." They show that they were violating the treaty between the government of the United States and the Creek Nation, and the Secretary was endeavoring to enforce the treaty by requiring them to comply with its terms. In thus acting, was he not within the scope of his authority? In United States vs Mullin (D. C.) 71 Fed. 682, 689, Judge Shiras says: "Nearly all judicial writs and process addressed to the marshal issue in the name of the President of the United States. The judicial branch hears, decides, and declares its judgment upon the questions brought before it; but when action is needed to enforce the judgment of the court, ordinarily, the appeal is to the executive powers of the government. The power to issue writs in the name and by the authority of the President of the United States is not because, in any sense, the President is a member of the judicial branch, but because he is the head and chief of the executive department of the national government. Therefore the fact that in a particular instance a writ is not based upon an order or judgment of a court or judge does not tend to show that it may not be a legal writ. Whenever, by the provisions of the Constitution, or of a treaty made in pursuance thereof, or of an act of Congress, the executive department of the government is charged with the performance of some duty or obligation, and, to secure due performance thereof, it becomes necessary that certain action be taken, and the executive department, acting through the proper channel, issues a written order or mandate requiring the doing of the appropriate act, and directing a proper person to execute such mandate or command, such writing is, in my judgment, a legal writ, * * * and an order in writing by him, issued to secure

the performance of the duty thus imposed upon him as an executive officer of the government, being an order requiring obedience upon the part of all within its terms, is therefore a legal writ, and any one who willfully obstructs or resists an officer of the United States in the service or execution of such an order is guilty of the offense defined in section 5398, Rev. St. U. S. (U. S. Comp. St. 1901, p. 3655), to wit, of obstructing or resisting the service or an execution of a legal writ."

If these orders of the Secretary of the Interior in the exercise of his control and supervision of this Indian tribe, and for the enforcement of the provisions of the treaty, had the force and effect of a legal writ, then it would seem that we misapprehended the authority under which appellees were acting; that, instead of acting unlawfully, they were engaged in the lawful performance of a duty. In deciding said case of Buster et al. vs Wright et al., supra, we say, after quoting the act of Congress approved May 27, 1902, and stating that it is by said act made unlawful to remove the purchaser in possession of a lot, that the property of plaintiffs cannot be seized and the doors of their business houses closed. "It follows that the only method left for the collection of the debt is through the ordinary channels of the courts." We were unquestionably mistaken in this suggestion, for the identical question had been passed upon in Crabtree vs Madden, 54 Fed. 431, 4 C. C. A. 408; this being the decision of the Circuit Court of Appeals for the Eighth Circuit, and a case appealed from the Indian Territory. Judge Sanborn, in delivering the opinion of the court, says: "The considerations to which we have adverted, and especially the conviction that, if Congress had intended to confer on the court in the Indian Territory a jurisdiction so extraordinary in its character and so far-reaching in its effects as that here claimed, it would not have failed to clearly and unmistakably express that intention, have forced us to the conclusion that it never did intend to confer that

jurisdiction. Nor do we find in this case any foundation on which to base the conclusion that the Creek tribe itself has either expressly or by implication prescribed or consented to so unique a method of enforcing its revenue laws.   *   *   *   Our conclusion is that the court below had no jurisdiction of this action, and the judgment below is affirmed, with costs." It was thus expressly held in 1893 that the courts of this territory had no jurisdiction to collect taxes for the Creek Nation.

For the errors committed by this court in the former decision, we are of the opinion that said case should be overruled. We have at this term decided the same question presented by this record in the case of J. W. Zevely et al., Appellants, vs W. G. Weimer et al., Appellees, 5 Ind. Ter. Rep. (——) (82 S. W. 941), on appeal from the Central District, Ind. Ter., in which we have endeavored to present the views of the court more at length than in this decision. Reference is respectfully made to the decision in that case.

It is our opinion that the court below did not err in dismissing the complaint and refusing the injunction, and its judgment is therefore affirmed.

GILL, J.   In the above case I concur with the judgment of the court, but do not concur in the reasons given by the court. In this case at the time of the institution of this suit the title to the town site of Wagoner, in the Creek Nation, still remained in the Creek Nation, and in my judgment said town site was then under the same laws, rules, and regulations as Indian country, and the underofficers of the Secretary of the Interior, under the laws of the United States and treaties with the Creek Nation, and the rules of the department, were authorized to compel noncitizens doing business in said nation to comply with the conditions under which said business might be transacted therein.

And it is for this reason that I concur in the opinion of the court.

CLAYTON, J.   I cannot agree with the opinion and judgment of the majority of the court in this case.

The act of Congress of June 30, 1834, c. 161, §§ 2—4, provided as follows:

"No person shall be permitted to trade with any of the Indians in the Indian country without a license therefor from a superintendent of Indian affairs, or Indian agent, or sub-agent, which license shall be issued for a term not exceeding two years for the tribes east of the Mississippi, and not exceeding three years for the tribe west of that river.

"Any superintendent or agent may refuse an application for a license to trade, if he is satisfied that the applicant is a person of bad character, or that it would be improper to permit him to reside in the Indian country, or if a license, previously granted to such applicant, has been revoked, or a forfeiture of his bond decreed.   But an appeal may be had from the agent or the superintendent to the Commissioner of Indian Affairs.

"The superintendent of the district shall have power to revoke and cancel any license to trade within the Indian country whenever the person licensed has, in his opinion, transgressed any of the laws or regulations provided for the government of trade and intercourse with the Indian tribes, or whenever, in his opinion, it is improper to permit such person to remain in the Indian country.   No trade with the tribes shall be carried on within their boundary, except at certain suitable and convenient places, to be designated from time to time by the superintendents, agents and sub-agents, and to be inserted in the license. The persons granting or revoking such licenses shall forthwith report the same to the Commissioner of Indian Affairs, for his approval or disapproval.]

"The President is authorized, whenever in his opinion the public interest may require the same, to prohibit the introduction of goods, or of any particular article, into the country belonging to any Indian tribe, and to direct all licenses to trade with such tribe to be revoked, and all applications therefor to be rejected. No trader to any other tribe shall, so long as such prohibition may continue, trade with any Indians of or for the tribe against which such prohibition is issued.

"Any person other than an Indian who shall attempt to reside in the Indian country as a trader, or to introduce goods, or to trade therein without such license, shall forfeit all merchandise offered for sale to the Indians, or found in his possession, and shall moreover be liable to a penalty of five hundred dollars."

Sections 2129 to 2133, Rev. St. U. S., 4 Stat. 729, c. 161.

By the same act (sections 2124, 2125, Rev. St.) the penalty provided by section 2133 was to be enforced by the courts having at that time jurisdiction over that country, and not by the Interior Department.    These sections are as follows:

"Section 2124.  All penalties which shall accrue under this title shall be sued for and recovered in an action in the nature of an action of debt, in the name of the United States, before any court having jurisdiction of the same, in any state or territory in which the defendant shall be arrested or found, the one half to the use of the informer and the other half to the use of the United States, except when the prosecution shall be first instituted on behalf of the United States, in which case the whole shall be to their use.

"Section 2125.  When goods or other property shall be seized for any violation of this title, it shall be lawful for the person

prosecuting on behalf of the United States to proceed against such goods or other property, in the manner directed to be observed in the case of goods, wares and merchandise brought into the United States in violation of the revenue laws. "

Section 2133 provides the only penalty, and sections 2124 and 2125 the only remedy for collecting it, that then existed. And the remedy was exclusively with the courts.   It is true that by section 2149, Rev. St., "the Commissioner of Indian Affairs is authorized and required, with the approval of the Secretary of the Interior, to remove from any tribal reservation any person being therein without authority of law, or whose presence within the limits of the reservation may, in the judgment of the Commissioner, be detrimental to the peace and welfare of the Indians; and may employ for the purpose such force as may be necessary to enable the agent to effect the removal of such person." But this section did not authorize the Commissioner to collect the license or seize the goods; nor did it give him power to pass upon these questions, further than to incidentally determine whether or not the party was in the Indian Territory "without authority of law," or that "his presence within the limits of the reservation may be in the judgment of the Commissioner, be detrimental to the peace and welfare of the Indians." In other words, he might use the evidentiary fact that he was introducing goods without paying the license fee required by law to establish the main fact that he was in the country without authority of law, or that his presence was detrimental to the peace and welfare of the Indians; and having established, in his judgment, the latter fact by proof of the former, he would have jurisdiction to remove him from the territory, not because he had power to remove for selling goods without license, but because that fact made of him a man unlawfully in the Indian Territory, or was the cause of his presence being detrimental to the peace and welfare of the Indians.   And section 2150, Rev.

St., does not confer any power on the Secretary of the Interior to seize goods, or collect a license fee for their introduction and sale. It is as follows: "Section 2150. The military forces of the United States may be employed in such manner and under such regulations as the President may direct: First. In the apprehension of every person who may be in the Indian country in violation of law; and in conveying him immediately from the Indian country, by the nearest convenient and safe route, to the civil authority of the territory or judicial district in which such person may be found, to be proceeded against in due course of law. Second. In the examination and seizure of stores, packages and boats, authorized by law.. Third. In preventing the introduction of persons and property into the Indian country contrary to law; which persons and property shall be proceeded against according to law. Fourth. And also in destroying and breaking up any distillery for manufacturing ardent spirits set up or continued within the Indian country." This section relates entirely to the use of the military forces in enforcing the law in this territory, and they could only be used in the manner and for the purposes named in the statute; that is, first, in the apprehension of persons who may be in the Indian country in violation of law, as provided in section 2147; second, in the examination and seizure of stores, packages, and boats as authorized by law (referring to section 2140, which provided for the seizure and forfeiture of those things for the violation of the law relating to introduction of spirituous liquor into the Indian country, to be condemned, however, only by the courts); third, in preventing the introduction of persons and property into the Indian country contrary to law. But it provides that such persons and property shall be proceeded against according to law. And in the case of a trader, by sections 2124 and 2125, the penalty is to be enforced, and the property condemned, and the proceeds distributed by a court of justice. And thus the law stood, as to the Creek Nation, up to 1856, and, as to the Choctaw

and Chickasaw Nations, up to 1866.

By the Creek treaty proclaimed August 28, 1856 (Rev. Ind. Ter. 104, art. 17) (11 Stat. 104), it is provided: "All persons licensed by the United States to trade with the Creeks or Seminoles shall be required to pay to the tribe within whose country they trade a moderate annual compensation for the land and timber used by them, the amount of such compensation, in each case, to be assessed by the proper authorities of said tribe, subject to the approval of the United States agent therefor." Article 15 of the same treaty (11 Stat. 703) had already provided that all persons trading in the Creek Nation, under license from the proper authority of the United States, should not be considered as intruders, and were permitted to live therein. It was the government of the United States that issued the license and received the fee; and, in case of the exposure of goods to sale without license, the penalty was collected by and paid to the United States, and the proceeds of the forfeited property was paid, one half to the informer, and the other half to the United States. The tribe got nothing by virtue of the license. It was to receive only, as a compensation for the rent of the land upon which the houses of the licensed trader stood, and for the timber he used, such price as might be fixed by the Creek Nation, subject to the approval of the Indian agent; and this was not a part of the consideration for the license fee. That was paid to the United States, and not to the Creek Nation, when the license should be issued. It was a condition of the agreement, implied at least, between the United States and the licensee, for the benefit of the Creek Nation, to be subsequently performed, whereby that nation was to be compensated for the use of the land and the price of the timber used, to be determined in the manner prescribed by the treaty, after the issuance of the license, and for a breach of which the United States government, by statute, had provided the following remedies, to wit: First, a

suit on the bond which the licensee was required to execute; second, a revocation of the license; and if, after the revocation of the license, he should continue in business, then, third, a seizure and condemnation of the goods; and, fourth, the recovery of a penalty of $500; and, fifth, removal from the country, to which, under a penalty of another $1,000, he could nevermore return. It is true that, when he was to be removed by the military forces, it was to be done humanely, and he had one other advantage. All of these remedies, except the removal, were to be enforced by the courts; and, even when removed, he was to be carried to the nearest judicial district, there to be turned over to the civil authorities.     It would seem that these remedies were amply numerous and sufficiently drastic as to the licensed trader.     But this suit is not brought against "licensed traders," but against those who, it is claimed, are trading without license, in violation of section 2129, Rev. St.     But section 2133, Rev. St., provides the penalty for that offense.     It is that the merchandise shall be forfeited, and that the offender shall pay a penalty of $500; and he may also be removed from the country, as above pointed out. The Creeks had no law punishing this offense, and, from the very nature of their government, were powerless to enact one as against white men.

And thus the law stood until July 31, 1882, when Congress passed the act entitled "An act to amend section twenty-one hundred and thirty-three of the Revised Statutes in relation to Indian traders" (22 Stat. 179, c. 360; 1 Supp. Rev. St. p. 362). That act is as follows: "That section twenty-one hundred and thirty-three of the Revised Statutes of the United States be and the same is hereby amended so that it shall read: 'Any person other than an Indian of the full blood who shall attempt to reside in the Indian country, or on any Indian reservation as a trader, or to introduce goods, or to trade therein, without such license, shall forfeit all merchandise offered for sale to the Indians or

found in his possession, and shall moreover be liable to a penalty of five hundred dollars.' Provided, that this section shall not apply to any person residing among or trading with the Choctaws, Cherokees, Chickasaws, Creeks or Seminoles, commonly called the Five Civilized Tribes, residing in said Indian country, and belonging to the Union agency therein. And provided further, that no white person shall be employed as a clerk by any Indian trader, except such as trade with said Five Civilized Tribes, unless first licensed so to do by the Commissioner of Indian affairs, under and in conformity to regulations to be established by the Secretary of the Interior.' " By this act every penalty provided by law for trading within the limits of the Five Civilized Tribes, including the Creek Nation, was repealed. But the statute still required a license, without which, by virtue of article 15 of the treaty of 1856, supra (11 Stat. 703), the trader was an intruder, and was to be removed by the United States. The language is: "All persons not being members of either tribe, found within their limits, shall be considered intruders, and be removed from and kept out of the same by the United States agents for said tribes, respectively (assisted, if necessary, by the military), with the following exceptions, viz.: Such individuals, with their families, as may be in the employment of the government of the United States; all persons peaceably traveling or temporarily sojourning in the country, or trading therein under license from the proper authority of the United States; and such persons as may be permitted by the Creeks or Seminoles, with the assent of the proper authorities of the United States, to reside within their respective limits without becoming members of either of said tribes." The traders with license were taken from the proscribed class, while those without license were to be considered as intruders, to be removed and kept out of the country. The fact that they were trading without license was to be taken as conclusive proof that they were intruders, and for being intruders the Interior Department of the United States

was to remove them.   And this was the only remedy left—one prescribed by mutual agreement of the governments of the United States and of the Creek Nation—and none other has been substituted by either of those governments.

By the act of May 27, 1902, c. 888, 32 Stat. 259, it is provided "that it shall hereafter be unlawful to remove or deport any person from the Indian Territory who is in lawful possession of any lots or parcels of land in any town or city in the Indian Territory, which has been designated as a town-site under existing laws and treaties; and no part of this appropriation shall be used for the deportation or removal of any such person from Indian Territory."   The town of Wagoner had been thus designated and laid off into a town, and the plaintiffs were in lawful possession of their lots within it.   By the act it was not only unlawful to remove them, but the funds necessary with which to do it were refused by Congress.   And thus every remedy known to the law was taken away.   It took an act of Congress to confer upon the courts the power to seize and condemn the merchandise, and a treaty stipulation, having the effect of an act of Congress, to confer upon the Interior Department the power to remove the person.   As to these appellants, both have been repealed.   And unless the absurd proposition can be maintained that a repeal of all existing remedies, without naming any other, ipso facto creates a new one, to be determined and enforced by an executive officer of the government, without any statutory direction, none exists.

The appellees, by their answers, rely upon the acts of Congress and the treaty of the United States with the Creek Nation, without naming them, and certain acts of the Creek Council.   In Maxey vs Wright 3 Ind. Ter. Rep. 243 (54 S. W. 807), we held that by virtue of the latter clause of article 15 of the treaty of 1856 (11 Stat. 703), "All persons peaceably travel-

ing or temporarily sojourning in the country, or trading therein under license from the proper authority of the United States, and such persons as may be permitted by the Creeks and Seminoles, with the assent of the proper authorities of the United States to reside within their respective limits without becoming members of either of said tribes," there was conferred upon the Creek Nation "the power of admitting into its territory, with the consent of the proper authorities of the United States, such 'other persons' than those named by it; and if it has that power it is equally clear that it may prescribe all reasonable terms upon the compliance with which such persons may be admitted;" and therefore that nation had the power to impose a license or tax on their products or business for the privilege of admission into their country and doing business therein. And this decision has been repeatedly and with commendation referred to by counsel for the appellees. But each and all have neglected or forgotten to mention the fact that by that decision we also held that the only remedy against those who refused to pay was removal. The provision of the treaty above referred to is the only authority pointed out by either statutory law or treaty granting to that nation this power. But in my opinion, it is ample. The question here, however, is not the power of the Creek Nation to require compensation for the privilege of doing business in their country, but, first, under the law as it now stands, does it have the power to impose it on the property owners doing business in the segregated town of Wagoner? And, second, if so, can it be collected in the way and by the methods complained of in the complaint?

If we were correct in our decision in Maxey vs Wright, supra—and I feel quite certain we were—in holding that the power of the Creek Nation to impose this tax rested upon the latter clause of article 15 of the treaty of 1856, and depended on the right of that nation to admit or exclude white persons from

their country, then, if the power to admit or exclude were taken away from them, the power to tax white persons would necessarily fail, because the one rested and depended upon the other. And as to cities and towns, this was done.    Holders of real estate in towns may now come or go as they please, without any reference to the laws of the Creek Nation, and without its consent. Before the passage of this act, that tribe could say to them, as it now can say to those out of the towns, "Pay, or we will refuse you entrance to our country."    Now entrance as to them can be had without their consent.    They now have nothing to offer in the way of compensation for the license fee, or any other tax—not even the protection of their sovereignty, which is the usual ground upon which the right of taxation depends.

The statute in force in the Creek Nation at the time of the threatened acts of defendants, and the one relied on by them and set up in their answer, was approved November 22, 1900, and is as follows:

"Be it enacted by the National Council of the Muskogee Nation:

"Section 1.    That all persons who are not citizens by blood of the Muskogee Nation, or who have not been adopted by the Muskogee Nation, and whose name do not appear on authenticated rolls of the Muskogee Nation, who shall desire to engage in any manner of business in the Muskogee Nation, shall obtain the consent of the United States government, and shall pay to the United States Indian Agent at Union Agency, Muskogee, Indian Territory, for the benefit of the Muskogee Nation, the annual permit tax hereinafter fixed; the same to be paid quarterly in advance in all cases, except where based on the cost of goods offered.    Quarters to begin January first, April first, July first and October first of each year.    All legitimate business houses

of whatever character or capacity engaged in the sale of all manner of dry goods, groceries, provisions, hardware, lumber, drugs, millinery, leather goods, or any other articles known or designated as merchandise, shall pay an annual tax of one half of 1 per cent. of the first cost of all goods offered for sale, excepting such goods as have been actually produced in the Muskogee Nation, or shall have been bought within the limits of the Nation, from trader who shall have previously paid this tax of one half of 1 per cent. of such goods; all payments to be accompanied by sworn statements, said statements to be verified by personal inspection by a proper inspector of the original invoices or the books of the trader. (Then follows the rate of taxation on 30 other classes of business and trades, such as hotels, printing offices, doctors, lawyers, shooting galleries, circuses, etc.)

"Section 2. Should any person refuse to pay the tax herein provided when due and when demand is made, or should any person refuse to permit a personal inspection to be made of original invoices, books, etc., such person shall be reported to the proper authorities for removal from Muskogee Nation. Failure to pay within ten days after tax is due and demand has been made shall constitute a refusal to pay.

"Section 3. This act shall become a law upon the approval of the President of the United States, and shall be in full force and effect from and after January first, 1901. All laws heretofore enacted by the National Council of the Muskogee Nation, relating to permit tax, which are in conflict with this act, are hereby repealed.

"Section 4. All classes of business in operation or which may hereafter be established in this nation not included in the above approval of the United States Indian agent.

"P. Porter, Principal Chief.

"Approved by William McKinley.   November 22, 1900."

This act dispenses with the duty of the collector, unless it be to receive from the Indian agent the money, and requires all traders to pay the license tax to the Indian agent. It names it as a tax, and the majority of this court, in their opinion, cite Crabtree vs Madden, 54 Fed. 426, 4 C. C. A. 408, to show that it is a tax, although in Zevely vs Weimer, handed down at this term, and the opinion written by the same justice in passing on the same question, a somewhat labored argument is made to show that it is not. The act requires all traders to pay the license tax directly to the Indian agent, and as all its own acts, and the acts of Congress and the treaties preceding it, except section 2133, Rev. St., above set out, which was repealed by the act of July 31, 1882, c. 360, 22 Stat. 179, had already done, provided the only remedy for nonpayment to be removal from the country. And therefore, neither by the laws of that nation, the acts of Congress, nor treaty stipulation, had any other remedy been provided.

In the case of Crabtree vs Madden, supra, the United States Circuit Court of Appeals for the Eighth Circuit decided that the courts of the United States could not entertain jurisdiction to enforce the payment of this money, because it was a tax. The court say: "The tax which it is sought to collect by this action was imposed by the laws of this tribe (the Creeks). If the tribe had lawful authority to impose it, it had equal power to prescribe the remedies and designate the officer to collect it. The presumption is that it has done so, and that it has provided some of the usual remedies, and designated the officers to collect it. * *. * The counsel for plaintiffs attempts to escape from this conclusion by the argument that this tax is a debt; that it arises upon an implied contract; that the court has jurisdiction to enforce such contracts, and hence this action. This position is not tenable. Taxes are not debts." And the opinion of the court in that case points out the remedy. It says: "The claim

that the authority of the Interior Department and the Indian agents to remove from the territory of the Indian tribes licensed traders who refuse to pay taxes lawfully levied upon them by the tribes, and thus to enforce their payment, which was exercised before the establishment of the court below, has been withdrawn because jurisdiction was conferred upon that court to enforce the collection of such taxes, is unfounded, because no such jurisdiction was conferred upon that court, and the remedy for the enforcement of lawful taxes through the Indian agents remains in the same condition in which it was before that court was created." But that remedy granted to the Interior Department has now been, as to these appellants, taken away, and none other substituted for it, and therefore none exists. If, then, the appellees were resorting to the remedy of closing up the stores of traders in the cities and towns of the Indian Territory for the purpose of collecting this tax, they were not only attempting to collect a tax levied without power to enforce, but were using a remedy purely of their own invention. No law authorized it at that time or any other, and it had never been resorted to until after the repeal of the removal clause of the statute. That the object sought to be obtained was the collection of the tax is unquestionably established by the pleadings and facts of the case. The complaint alleges that defendants, in their official capacity, on August 21, 1901, went to the town of Wagoner, and "notified the Wagoner Hardware Company that, unless they paid a certain sum demanded by said Cobb by one o'clock of that day, he would close up their place of business and that, if they attempted to open up their place of business, that they would be reported by the Indian inspector to the Secretary of the Interior, and an order asked for their removal from the Indian Territory, as it was the intention of the Interior Department to prevent them from doing business any further until they paid the sum demanded, which it is claimed is a tax on merchants levied by the authorities of the Creek Nation for the privilege of

doing business in the Creek Nation; that said Cobb made similar threats to each of the other plaintiffs, and notified them that he had his Indian police ready for the purpose of carrying out said threats, and that they certainly would be closed at the time designated unless they paid the sum demanded of them." The answer admitted this allegation of the complaint, and avers that their action was directed by the Indian inspector and the Indian agent.

The statement of facts upon which the case was tried is: "It is hereby stipulated and agreed by and between the parties plaintiff and Maxey & Hunt, their attorneys of record, and the parties defendant and their attorney of record, William M. Mellette, United States attorney, that this cause be submitted to the court for final hearing upon the complaint and answer filed herein. And there being no dispute between the plaintiffs and defendants as to the facts in this case, it is hereby agreed that the several allegations of fact in the complaint be taken as true, and the several laws of the Creek Nation and the several regulations of the Secretary of the Interior set forth therein are true copies of the original laws of the Creek Nation and the original regulations of the Department of the Interior, duly promulgated." No fair or sensible reading of the complaint can be had whereby any other object in the threatened closing of the doors was anything but for the purpose of collecting the tax. It is worthy of notice in this connection that neither the Indian inspector, the Indian agent, nor any other officer of the United States was sent to perform this duty, but the Indian tax collector was there to receive the money, and the Indian police to close the doors if payment was refused. And the fact that they threatened to report the appellants to the Secretary of the Interior for removal—that having theretofore been the remedy—evidences to a certain extent their purpose to collect the tax. They were to be kept closed, not until they should procure a

license, but until the sum demanded should be paid. And hence the argument of counsel that the object of closing the doors was for the purpose of preventing the exposure of the goods for sale, and not to collect the tax, is futile, and a square backing away from the case as it is made.

Is this a mere license, or is it a tax? Judge Cooley, in his work on Taxation (2d Ed.) 572, points out the distinction as follows: "But license and tax do not necessarily go together. A license may be required when no tax is imposed, and an unconditional license does not exempt the licensee from being taxed upon the privileges it gives him. In this particular all valuable privileges stand upon the same footing. They are all liable to taxation at the will of the state, unless the state has bargained to exempt them. As is said in one case: 'There is a clear distinction recognized between a license granted or required as a condition precedent, before a certain thing can be done, and a tax assessed on the business which that license may authorize one to engage in. A license is a right granted by some competent authority to do an act which, without such authority, would be illegal. A tax is a rate or sum of money assessed upon the person, property, etc., of the citizen.' The privilege obtained by the license may therefore be taxed in consideration of the property value it possesses, and this not only by the state directly, but by the county and town also, if proper authority has been conferred upon them for the purpose." If the defendants are required to procure a license at all, which, at best, is extremely doubtful, they must procure it from the United States, which imposes no tax, and therefore, as to that, it is a license. But as to the Creek Nation, the duty to pay is imposed by the laws of a government which does not issue any license. As to the licensee, the assessment and levy only become operative after the license has been procured. And therefore, as to the license issued by the United States, if one be required, in the language of Judge

Cooley, it is "a license granted or required as a condition precedent before a certain thing can be done," to wit, the exposure of goods for sale in the Creek Nation. But as to the Creek Nation, "it is a tax assessed on the business which that license may authorize one to engage in." And by this definition it is clearly a tax. And if the license and the assessment of the tax were to emanate from the same government, it would make no difference, because the issuance of the license to do business in the country would make the assessment on the various kinds of business authorized to be done by the licensee none the less a tax. A license is simply an authority to do a certain thing. A tax is a sum assessed by the statute on the business authorized to de done by the license.

It is the law that taxes cannot be collected through the courts, unless specially empowered to do so. And it is also the law that an executive officer cannot collect a tax unless the statute specially designates him and provides the remedy which must be strictly pursued, and, before he can seize property or lay his hands on it for that purpose, he must be possessed of a warrant emanating from the proper source. "The authority of a collector of taxes to collect is his warrant. The duplicate is but a memorandum of the amount he is to collect from the parties therein named, respectively. Without a warrant, the collector becomes a trespasser as soon as he intermeddles with the property of the taxpayer. There must also be a law authorizing the issuance of a warrant, and some person appointed to issue it, and it must conform to the law authorizing it, and be issued by the proper person designated by law, or it is no protection to a collector." Hilbish vs Horner, 58 Pa. 93. And Mr. Cooley, in his work on Taxation (2d Ed.) 424, after citing the above quotation from Hilbish vs Horner, says: "No question is made anywhere of the correctness of this doctrine." Wherever the Constitution of the United States is in force, taxes can

only be lawfully collected after the fulfillment of the above-stated requirements. And by an act of Congress entitled "An act to provide a temporary government for the territory of Oklahoma, to enlarge the jurisdiction of the United States Courts in Indian Territory, and for other purposes," approved May 2, 1890, c. 182, 26 Stat. 81, it was specially provided that "the Constitution of the United States　*　*　*　shall have the same force and effect in the Indian Territory as elsewhere in the United States." And from that time, at least, the people of the Indian Territory have been under its protection, and entitled to all the constitutional rights and privileges as other American citizens, among which are that they "shall not be deprived of their property without due process of law," and that they "shall be secure in their persons, houses, papers and effects against unreasonable searches and seizures," and "no warrant shall issue but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched and the persons or things to be seized." And however much this may hamper the officers of the government in the difficult task they are required here to perform, we cannot help it. It is here by act of Congress, and full force and effect must be given to it. And while it is true that taxes may be, and usually are, collected by an executive officer, it must be done only in strict accordance with the remedy provided by statute, in which case it is "due process of law;" but if performed otherwise than the statute provides, or when no remedy is provided, it is not due process of law, and therefore unconstitutional. And if the proposed closing of the doors and seizure or detention of the merchandise be for the purpose of collecting a tax, as is admitted by the statement of facts, it would be unlawful. And if this should not be a tax, but a debt or money due on a permit or a license, or anything else, the result would be the same. It could not be constitutionally collected by an executive officer without warrant or process, or a remedy fixed by law. And therefore, as it is admit-

ted in this case that the defendants were threatening to close the doors of plaintiffs' storehouses, and seize and hold their goods for the collection of money, without warrant or process, or by and through a remedy pointed out by law, the judgment of the court below should be reversed on this ground.

But if, in contradiction to the admitted facts, it could be held that the action of the defendants was solely for the purpose of preventing plaintiffs from exposing merchandise for sale without having first procured from the United States a license, and that this was required by law, still the defendants could not prevent it by the remedy resorted to. What did they propose to do? It was to close the doors until the sum demanded should be paid. Let us eliminate the words "until the sum demanded should be paid," and insert the words "until a license to trade in the Creek Nation should be procured." Any attempt on the part of plaintiffs to open their doors or interfere with their possession was to be prevented by reporting them to the Secretary of the Interior for removal. The closing of the doors of a storehouse against the will of its owner by an officer acting in his official capacity is a taking of the possession of the storehouse itself, and all of the merchandise or other property contained in it. And whether he have legal authority or not, and no matter whether they are rightfully or wrongfully taken, it is a seizure of them. In this case the plaintiffs were not charged with a crime, and not even with a penal offense, for all penalties and remedies had been repealed. If the defendants had the right to close the doors, and thus possess themselves of the storehouses and goods for this purpose, they had the right, and it was their duty, to keep them closed and hold possession until their lawful demand was complied with. But suppose that the owner of the property, believing that the law did not require him to procure the license, or even believing that it did, stubbornly should refuse to pay, then what would become of the storehouse and the merchandise?

It could not be sold and the money paid to the government, for that would be a forfeiture, which is prohibited by the statute of July 31, 1882. Nor could a part of it be sold, sufficient to pay the tax, and the proceeds turned over to the Creek Nation, and the balance of the goods turned back to the owner, as is done by execution, because that would be the collection of a tax or debt without "due process of law." Besides, this was not the purpose of the seizure. It could not be abandoned, because, if it were, the owner would enter and proceed to sell, and the same process would have to be repeated. If the owner should hold out until the building should sink in decay and the goods should rot, they might then safely be abandoned. But why not burn them in the first instance, and save all further trouble and expense? The result sought would be the same. The only difference would be that the one remedy may result in the destruction of the property; the other certainly would. Of course, it is not probable that this result would follow, but it is possible, and the bare possibility of such a result should condemn it as a remedy. Or why not seize the person of the trader, and lock him up in jail until he should procure the license or pay the tax? There is no statute law against it, except the Constitution forbids it to be done. And so, by the same clause, the Constitution forbids the seizure of the property. Many remedies may be thought of that are not forbidden by the statute. But is it possible that, in a government that so jealously guards the liberties and the property rights of the individual citizen, an executive officer, by virtue of his office alone, has the unbridled power to select and enforce any remedy he may think proper, because it may not be forbidden by the statute? Rather is it not the law that the statute must name the remedy, and the officer must be armed with process? And it is no answer that the Secretary of the Interior is possessed of large quasi judicial powers. The extra powers only give to him the right to hear and determine. It is only by virtue of his executive power that he executes his judg-

ments, just as a marshal or sheriff executes the judgments and decrees of the court in which he serves. In this case, by virtue of his judicial power to hear and determine, he must have found, as a matter of law, first, that licenses from the United States were still required of traders in the Indian Territory; and, second, that that law was still in force in the cities and towns. And then he must have found, as a matter of fact, that the defendants were trading in the town of Wagoner without a license. And after having found the law and the facts against the defendants, seeking for the remedy whereby, by this judicial finding, he could direct himself, as the executive officer, to execute it, he necessarily must have come face to face with the fact that none were provided by law as against the property. It is true that at that time the remedy of removal still existed, for the statute prohibiting removal of those holding real estate in the towns had not been passed. But as the act was passed pending this litigation, we have treated it as if it were in force at the time of the threatened acts. And this is certainly more favorable to defendants' contention, because, if there really existed a lawful remedy prescribed by the statute, it was the duty of these officers to have resorted to that, instead of one that had been repealed, and the right of seizure had been repealed.

When the Secretary, acting in his judicial capacity, found that there was no remedy provided by law by which he could cause his judgment to be performed, is it possible that he could resort to one which had been repealed, or to any other not provided by law? Courts of justice, with all of their judicial powers, cannot do that. Where the law provides no remedy for a wrong, courts of equity alone have the power to find one; and even then they, with all their powers, must enforce their decrees by the usual remedies allowed by that tribunal, and this is not one of them.

But this is most certainly a seizure of the property of an American citizen, living under the protection of the Constitution of the United States, without any statutory law to permit it, and forbidden in the way contemplated to be done by the seizure clause of the Constitution, and it is not "due process of law." It is nonsense now to undertake to construe the provisions of the Constitution differently here than elsewhere. Congress has extended that instrument over us, and, by the very language of the act, "it shall have the same force and effect in the Indian Territory as elsewhere in the United States." It is surely the law that before an officer can lay his hand officially on the property of a citizen, or in any wise intermeddle with it, there must be statutory law authorizing it, and a remedy provided. And the power to seize cannot be gathered from forced construction, or mere shadowy inference, but the act must specifically confer it, with the remedy to be strictly complied with; and when, as in this case, the statute has abolished all penalties and all remedies, an officer cannot create and enforce another.

The argument that the Creek Nation had the power to impose this license fee, as it is called, prior to and independent of the treaty of 1856 (11 Stat. 699), is begging the question. I have conceded the power, and it makes no difference from whence it came or how it was granted. The Creek Nation, as well as the United States, has provided no remedy, and has granted no power to collect it by the methods attempted here, and none now exists. Had the Creek Nation provided such a method, it could not have been enforced against a white man exercising the rights conferred by the Constitution.

It is also argued that because the Government, ever since its organization, has controlled Indian affairs through the Interior Department, and because its powers are vast, and because the head of that department possesses large quasi judicial

and discretionary powers, and the necessity of the case, he had the power to find a remedy, even when all have been taken away by Congress. If this be granted, he must find one that is allowed, and enforce it in a manner prescribed by the law, and not forbidden by the Constitution.

Many statutes and treaties have been referred to, showing the extent of the powers of these Indian tribes, but had they all of the sovereign powers of a state of the Union, or of the United States, or both combined, with the laws and Constitution as they now exist, they would not have the power to collect this license fee in the manner and by the methods here proposed.

We are referred to that provision of the Constitution of the United States which provides that Congress shall have the power to "regulate commerce with foreign nations and among the several states, and with the Indian tribes." But it is Congress that has this power, and therefore we must look to the statutes which it has enacted, to find what power it has conferred on the departments in this respect; and, when we do, we look in vain to find that it has conferred the power claimed. Much stress is laid on the fact that the "Indians are the nation's wards," and therefore they should be treated kindly and liberally and justly by the government. And this is true. But I submit that they are not entitled to more consideration than its own citizens, who are a component part of itself. This argument would come with more force if the Indian tribes could offer some compensation for the money they seek to recover. They have sold these lands upon which these men live and do business, and have received the price. The timber which they use is paid for. They give to these men no governmental protection. The taxes are used solely for their own purposes, and without benefit to the inhabitants of these towns. They sold the right to grant permission to enter their country when they sold the lands. The payment of the tax is absolutely without consideration.

For the reasons above stated, it is again my opinion that the judgment of the lower court should be reversed.

There is another reason, in my opinion, why the judgment in this case should be reversed. That the court has jurisdiction to enjoin an unauthorized act of a head of a department, see School of Magnetic Healing vs McAnnulty (decided by the Supreme Court of the United States at its October, 1902, term) 187 U. S. 94, 23 Sup. Ct. 33, 47 L. Ed. 90, which, in short, decides that although the head of a department, in the exercise of his quasi judicial powers in passing upon the facts of a case on the proof before him, decides that the alleged acts are in violation of the law under which he is authorized to proceed, if they clearly are not in violation of such law, his decision is an error of law, and the courts have jurisdiction to hear and determine it; that behind the decision of the head of a department there must be some valid law upon which it is based; otherwise the acts done under them, if subversive to individual rights, will be arrested by the courts. The complaint in this case fairly presents the question as to whether or not there is any valid law upon which the collection of these tribal taxes can be based. The plaintiffs, in effect, say that they are not amenable to the Creek law in this particular; that the Creek Nation has no lawful authority, in its present condition, to levy a tax upon them, or to interfere with their free and unrestricted enjoyment of the land which they have bought, and upon which they are doing business. The complaint challenges the applicability to them of the law under which the officers of the Interior Department are presuming to act, and say that, as to them, it is no longer in force, and therefore there is no law justifying the threatened acts of the defendants. And if this be true, notwithstanding the decision of the honorable Secretary of the Interior that the tax is lawful and the amounts sought to be collected due, the courts have jurisdiction to enjoin the unlawful collection of them.

The principal question, then, to be determined, is, under the present conditions and the law as it now exists, is the tax sought to be collected a legal one? Is it founded on an existing, valid statute? If not, the court clearly has jurisdiction, and it is its duty, to enjoin the unauthorized acts.

For the first time since the passage of the various acts and agreements relating to town sites in the Indian Territory, the question as to whether these taxes can be lawfully levied and collected from landholders in these towns at all is presented for the consideration of the courts. In Maxey vs Wright, supra, we specially declined to pass on this question, because at that time the provision of the statutes had not been carried into effect. The various statutes and treaties relating to this matter, including the act of the Creek Council imposing the license tax, have heretofore been set out, and need not be repeated.

The agreement of the United States with the Creeks, providing for the creation of towns and the sale of lands within their limits, approved March 1, 1901, c. 676, 31 Stat. 861, after providing the manner and process by which towns in the Creek Nation should be segregated from the public domain and laid off and platted into streets and alleys, lots and blocks, etc., provides that all the lands shall be sold in manner as provided by sections 11 to 15, inclusive. Persons owning improvements on them were to have certain advantages. As to all purchasers, the first payment of 10 per centum of the appraisement of the owner of an improvement, and of the bid offered at the public auction as to all others, was to be paid within 60 days after notification of the appraisement as to the one, and after the sale as to the other, and 4 months thereafter 15 per centum of the amount was to be paid, and the balance in three equal annual installments; interest to be paid at the rate of 10 per centum per annum if not paid when due. Section 30 provided as follows: "All deferred

payments, under provisions of this agreement, shall constitute a lien in favor of the tribe on the property for which the debt was contracted, and if, at the expiration of two years from the date of payment of the fifteen per centum aforesaid, default in any annual payment has been made, the lien for the payment of all purchase money remaining unpaid may be enforced in the United States Court within the jurisdiction of which the towns located in the same manner as vendors' liens are enforced; such suit being brought in the name of the principal chief, for the benefit of the tribe." Under this agreement the whole of the town of Wagoner was laid off and sold, and possession given to the purchasers. It was a sale of the land, with a vendor's lien reserved to secure the payment of the deferred installments, passed the whole fee to the grantor, and left no title or right of possession or occupancy in the tribe. Over the tract of land thus segregated and sold, by act of Congress, the Curtis bill, and the agreement of this nation, a municipal government absolutely alien to and independent of the Creek Nation was established. This government has all of the powers, and is to perform all of the duties, of city and town governments in Arkansas, and the laws of that state pertaining to the same are extended over them. It has the sovereign power of taxation, and the power to tax all occupations and privileges is specially granted by the Curtis bill. It has the power to establish and maintain a system of public schools, to preserve the peace, and perform all duties and exercise all powers of government conferred by the Constitution and laws on cities of that state. The mayor is made an ex officio United States commissioner and justice of the peace. It derives these powers, not from the Creek Nation, but from the federal government.

By a series of acts of Congress, commencing with an act entitled "An act to establish a court in the Indian Territory, and for other purposes," approved March 1, 1889 (chapter 333, 25

Stat. 783), a system of government has been provided for all persons other than Indians, and including them as well when they come in contact with white men in their civil contracts and conduct and when they commit crimes against them. The Constitution and laws of the United States have been put in force, and the great body of the civil and criminal laws of Arkansas, with its civil and criminal procedure, has been extended over the country and its people, and is in force here. A judiciary has been established, and courts located in various parts of the territory. It is true that these laws are not confined to cities and towns, but they embrace them, and, taken together with the municipal laws of the towns, give to their inhabitants a complete system of government, dependent upon, and owing their allegiance only to, the government of the United States. It is my opinion that when the Creek Nation agreed to the legislation segregating their lands from their public domain, and sold them for a price, and agreed that an alien and an independent government might be established over them, they parted with every vestige of sovereignty in relation to them, and with it their right of taxation. Not that this legislation, and sale of the land, and the establishment of, to them, a foreign government over them, destroyed such sovereignty as they may have had as an Indian nation, but it removed the particular tract of land, with its inhabitants, without the sphere of their governmental powers. "The power of taxation is an incident to sovereignty, and is coextensive with that of which it is the incident." Desty on Taxation, 90; Dobbins vs Erie County, 16 Pet. 435, 10 L. Ed. 1022; State Tax Foreign Bonds, 15 Wall. 300, 21 L. Ed. 179. "A tax is a tribute on property in return for the protection which the government affords its owner." Ex. Bank vs Hines, 3 Ohio St. 10; Desty on Taxation, 53. "The right to tax a person results from the protection afforded to himself, his business, and his property." Desty on Taxation, 53; Marsh vs Clark, 42 Wis. 509; Vattel's Law of Nations, bk. 1, c. 20; Black on Tax Titles, No. 2,

It has always been held by the courts that the sale of the Indian title by an Indian tribe of their lands, destroyed their sovereignty over them, and the intercourse laws of the United States at once became inoperative over the tract of land thus sold. The Supreme Court of the United States, in the case of Bates vs Clark, 95 U. S. 206, 24 L. Ed. 471, in defining what is Indian country, within the meaning of the acts of Congress regulating intercourse with the Indians, after citing the various acts of Congress relating to the same, say: "Notwithstanding the immense changes which have since taken place in the vast region covered by the act of 1834 (Act June 30, 1834, c. 161, 4 Stat. 729) by the extinguishment of Indian titles, the creation of states, and the formation of territorial governments, Congress has not thought it necessary to make any new definition of 'Indian country.' Yet during all this time a large body of laws has been in existence, whose operation was confined to the Indian country, whatever that may be. And men have been punished by death, by fine, and by imprisonment, of which the courts who so punished them had no jurisdiction, if the offenses were not committed in the Indian country, as established by law. These facts afford the strongest presumption that the Congress of the United States, and the judges who administered these laws, must have found in the definition of 'Indian country' in the act of 1834 such an adaptability to the altered circumstances of what was then Indian country as to enable them to ascertain what it was at any time since then. * * * The simple criterion is that, as to all the lands thus described, it was Indian country whenever the Indian title had not been extinguished, and it continued to be Indian country so long as the Indians had title to it, and no longer. As soon as they parted with the title it ceased to be Indian country, without any further act of Congress, unless by the treaty by which the Indians parted with their title, or by some act of Congress, a different rule was made applicable to the case."

In all of the cases that I have found in which the courts have held that the extinguishment of the Indian title removed the land from the Indian country, the title so extinguished was the original Indian title—the mere right of occupancy of the lands. "Upon the discovery and settlement of this country by Europeans, there was a kind of ownership of the territory recognized in the native tribes, though there seems to have been no well-defined idea of individual property in lands on the part of the natives, beyond, perhaps, the spot under immediate occupation. Nor has any title, beyond the right of occupation, been recognized in the native tribes by any of the European governments or their successors, the colonies, the states, or the United States. The law in this respect seems to have been uniform with all the Christian nations that planted colonies here. They recognized no seisin of lands on the part of the Indian dwellers upon it, and the Indian's deed was simply regarded as an extinguishment of his claim, and not as passing the soil or freehold. The title gained by the grantee grew out of his making an actual entry upon the land under a claim of title. It is accordingly true that in none of the English patents making grants of the country is the Indian title excepted, and even Penn had begun to fix his settlement under his patent before he conferred with the Indians as to the lands." 3 Washburn, Real Prop. 194. And the Supreme Court of the United States, in Bates vs Clark, supra, say: "It follows  *  *  *  that all the country described by the act of 1834 as Indian country remains Indian country so long as the Indians retain their original title to the soil, and ceases to be Indian country whenever they lose that title, in the absence of any different provision by treaty or by act of Congress." It was this original Indian title, which was only a right of occupancy, which gave to the tribes the power of sovereignty over the lands on which they dwelt, and made of them a part of the Indian country, no matter where located, within the limits named by the statute. And it was over such

lands, and them alone, that the intercourse laws were in force. Hence, when that title became extinguished, either by grant or by act of Congress, so that the Indians, as a tribe, could no longer occupy and live upon them, the intercourse laws, as to them, ceased to exist, because, the Indian being absent, there was nothing for them to act upon. The law over such territory failed, because "the reason for the law had failed." The Creek Nation have a fee-simple title to their lands, but their sovereignty does not depend upon the fee. I do not mean by this to say that, when an Indian tribe holds its lands by a fee-simple title, it has not the right of occupancy and the power of sovereignty over them; but I do mean to say that it is not the fee that gives to them the powers of sovereignty over the land. It is the right of occupancy, and when that is sold, and when they have removed from the lands, though the fee remains in the tribe, its sovereign power over such tract of land is ended. It is the right of occupancy that gives the title upon which their governmental dominion over the lands rests, while the fee only measures the extent of their property rights in and to them. They could sell the fee back to the United States, and still be permitted to live upon the lands as an Indian reservation, with all of the governmental and sovereign powers over them and of the people living on them that they now possess. The right of occupancy does not necessarily depend upon the fee. If so, the purchaser of an estate in lands, where a reversion is left to the grantor, could not occupy them, for the fee would be in the reversioner. The great mass of Indians living on reservations only have the right of occupancy, the fee being in the government. The right of occupancy may be sold, and the fee retained. But the Creeks have sold both the fee and the right of occupancy. They have, by their sale of the land and the terms of their conveyance, parted with all title, and, having surrendered possession, are therefore excluded from occupying them as a tribe except by a repurchase of them. Under the grant, no condition can possibly arise whereby they

can oust these purchasers of their possession by an action of ejectment or any other possessory process. They have parted with their title forever, and with it their right of occupancy, and, in addition, have permitted an alien government to be established over the tract of land thus sold, and thereby surrendered every vestige of sovereignty and governmental power theretofore existing over it.

What is the consideration for this large sum of money that the citizens of our towns are called upon to pay? As heretofore pointed out, it is paid to a government that can give them no protection, and to which they owe no allegiance, for the simple privilege of doing their ordinary business upon lands which they have bought, and in houses which they have built and paid for. No part of it is to be used for their benefit by the government to which it is paid. They now owe the Creeks no rent for the lands on which their buildings stand, and they pay for the timber which they use. The Creeks are entitled to nothing for the privilege of entering their country, because they have no power to exclude them. They have bought the lands, and, if they owe anything on that account, by the terms of the agreement it is to be collected in the courts, and they have a vendor's lien on the lands to secure its payment. It is certainly money to be paid without compensation or consideration—a mere gratuity. It is neither just nor equitable, and courts of justice should not be asked to strain the law to sustain by mere technicalities the collection of this extortionate tribute.

I am aware that the powers, both executive and quasi judicial, of the honorable Secretary of the Interior in the discharge of his official duties as the head of one of the great departments of the federal government, are great, and that his judgment of the validity of the law under which he assumes to act is worthy of the very highest and most respectful consideration. I

am also aware of the very high, onerous, and delicate duties that he is called upon to perform in the Indian Territory, and that the courts reluctantly tie up the hands of the officials of the departments by injunction or otherwise. But in my opinion, for the reasons given, the Secretary has no power to collect this money, or to use the remedy attempted; and, if that be true, justice to these people, and the highest duty of the courts, demand action in the case.

On each and all of the grounds above pointed out, it is my opinion that the judgment of the court below should be reversed.

Since writing the foregoing dissenting opinion, I learn that the land in Wagoner had not been sold at the time of the threatened seizure, but that it was done pendente lite. And if it should be held that this left the title in the Creek Nation, still the proceeding had gone so far that their right of occupancy was gone. The town had been, by provision of law, segregated by a survey of the metes and bounds, and the laying off of streets, alleys, lots and blocks; and the statute provided, in substance, that, when this was done, the owner of improvements on them should have the exclusive right of possession, and the complaint alleges all this was done. But if, because of this, it may be held that this is not sufficient, then the conditions were that a remedy then existed, provided by law, to wit, removal, which was in full force, and it was the only one provided by statute, and therefore that should have been adopted, in the place of a new and novel one that had not been provided for by law, and that never had been resorted to, and was forbidden by the Constitution, in the way that this seizure is contemplated to be done, as I have attempted to show in this opinion, on the first two branches of this case. If this be not true, then it is the law that "if there has been a change or alteration or repeal of the law applicable to the rights

of the parties after the readition of the original judgment, and pending an appeal, the case must be heard and decided in the appellate court according to the existing law." Sutherland on Statutory Construction, p. 221, § 164, and cases cited in footnote 3.

I fully agree with the honorable Assistant Attorney General, Mr. Leslie C. Fuller, that "this great case ought not to turn upon punctilious questions of literal consistency, but upon the real and important question, whether or not the decree complained of was rendered in accordance with the right and justice of the case." The disturbed condition of the country ought to be finally settled upon its present condition in relation to this matter, and not be left to the turmoil and uncertainties of future litigation. I trust that the case may be definitely determined, so that the people may rest in that tranquillity which always follows a definite, a just, and a fixed disposition by the courts of their rights and duties.